[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 405 
Carl Allen Goetsch ("the father") and Joyce P. Goetsch ("the mother") are before this court on an appeal from the parties' extremely acrimonious divorce and postdivorce proceedings. This is, in fact, the third time these parties have been before this court. The mother appealed the original divorce judgment, which awarded custody of the parties' children to the father; we affirmed that judgment without an opinion. Goetsch v. Goetsch, 885 So.2d 858
(Ala.Civ.App. 2003) (table) ("Goetsch I"). WhileGoetsch I was pending on appeal, the Department of Human Resources ("DHR") instituted a dependency action regarding the children; that action was dismissed after DHR concluded its investigation. The mother then filed a complaint seeking, among other things, a modification of custody. The father counter-claimed seeking a modification of certain visitation provisions in the original divorce judgment; he also petitioned to have the mother held in contempt for her failure to comply with certain provisions of the original divorce judgment, including a provision requiring her to cancel a life insurance policy she had taken out on the father, and for failing to return to the father certain items of personal property awarded to him in that judgment.
After a trial in July 2004, the trial court entered a judgment on July 28 awarding the parties joint legal custody of the children and awarding physical custody of the children to the mother. That judgment also ordered the father to pay $7,000 per month in child support. The father's claims seeking enforcement of the original divorce judgment regarding the mother's alleged failure to return certain property to the father and her failure to produce proof that she had canceled a life insurance policy she had taken out on the father were denied. The mother's other claims were denied as well.
The father appealed the trial court's modification judgment, arguing, among other things, that the trial court had erred by failing to admit the deposition testimony of Dr. Caroline Batchelor. We reversed the trial court's judgment because the failure to admit that deposition testimony was error.Goetsch v. Goetsch, 949 So.2d 155 (Ala.Civ.App. 2006) ("Goetsch II"). Because the trial court could have altered the judgment on remand after consideration of Dr. Batchelor's testimony, we pretermitted consideration of the father's other arguments. Goetsch II,949 So.2d at 158.
On remand, the trial court, as instructed, admitted Dr. Batchelor's deposition testimony and then entered a judgment stating that, after consideration of the deposition testimony in conjunction with the other evidence of record, the court had concluded that the custody-modification judgment of July 28, 2004, should remain unchanged. After the father's timely post-judgment motion was denied, he appealed again.
The father raises three issues on appeal. He first argues that the trial court erred in *Page 406 
transferring custody to the mother because, he contends, the mother failed to meet the burden imposed by Ex parteMcLendon, 455 So.2d 863 (Ala. 1984). The father further argues that the award of $7,000 per month in child support is not supported by any evidence regarding the needs of the children. Finally, he argues that the trial court erred by failing to enforce certain provisions of the divorce judgment with which, the father contends, the mother had failed to comply.
I. The Custody-Modification Issue
We first consider the father's argument that the trial court erred by modifying custody because, he contends, the mother failed to meet the burden imposed by Ex parteMcLendon. The Ex parte McLendon standard is well settled.
 "The correct standard [to be applied in custody-modification proceedings in which one parent was favored over the other in the original custody award] is:
 "`. . . [T]he [noncustodial] parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child's welfare.'
 "Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947), quoting the Supreme Court of Virginia, String fellow v. Somerville, 95 Va. 701, 29 S.E. 685, 687, 40 L.K.A. 623 (1898).
 "Furthermore,
 "`[This] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court's satisfaction that material changes affecting the child's welfare since the most recent [judgment] demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.'
"Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App. 1976).
 "It is not enough that the parent show that she has remarried, reformed her lifestyle, and improved her financial position. Carter v. Harbin, 279 Ala. 237, 184 So.2d 145 (1966); Abel v. Hadder, 404 So.2d 64 (Ala.Civ.App. 1981). The parent seeking the custody change must show not only that she is fit, but also that the change of custody `materially promotes' the child's best interest and welfare."
Ex parte McLendon, 455 So.2d at 865-66.
Much of the testimony at the 2004 modification trial consisted of the testimony of the parties and the children. The children testified in general that they did not want to live with their father, that he was mean, that he hit them, that he yelled at and directed profanity toward them, that he drank alcoholic beverages in their presence, and that they wanted to live with their mother. The parties' twins, Michael and Courtney, who were 11 years old at the time of trial, explained that their father hit them with newspapers or magazines as a form of discipline in what could best be described as a "swatting" on the bottom. Chris, the parties' oldest child, who was 13 years old, at the time of trial, testified that the father did not spank him since the divorce but that sometimes the father would hit Michael or Courtney with a newspaper or magazine. Michael also stated that sometimes the father would hit him on the back or shoulder as a form of punishment. *Page 407 
Michael and Courtney also testified that the father drank alcoholic beverages in their presence. Chris, however, testified that, although the father did drink alcohol in their presence while on vacation, he did not do so at home in Huntsville; instead, he said, his father would drink nonalcoholic beer on those occasions. Michael and Chris testified that they had seen empty bottles of alcohol, often wrapped in paper bags, in either a drawer or in a car that was seldom driven. According to the children, they could tell when their father had been drinking because he seemed angrier or more emotional during those times. Michael and Courtney stated that, when he had been drinking, the father would become red-faced as well. However, the children did not specifically testify concerning how often their father would drink in their presence.
All the children complained that they did not like the public schools in which the father had enrolled them and that they preferred the prestigious private school that they had previously attended. Specifically, the children testified that they were not being "challenged" at the public schools they attended. They also complained that the food at the private school was better than the food at the public school, although the children admitted that they often took their own lunches from home to school. The report cards of all three children for the 2003-2004 school year were admitted as exhibits; all three of the children performed well academically.
According to the children, the father often relied on babysitters or took them to one of his three places of employment after school. The children testified that the doctor's lounge at Crestwood Hospital was their favorite of the father's employment sites because it had a big television and access to food. The children specifically discussed their dislike of the father's girlfriend, Peg Rochine, who watched them frequently when the father was on call. Ms. Rochine spent considerable time at the father's home and assisted him by performing housework and tending the yard. The children indicated that the father and Ms. Rochine were affectionate in their presence and stated that they might lie down together while watching movies. Courtney and Chris testified that once they had looked into the father's bedroom window upon returning from visitation with their mother and had seen the father and Ms. Rochine in bed together. Courtney also described an incident when she returned to her father's van during a softball practice and discovered the father and Ms. Rochine engaged in an intimate act.
At the time of the modification trial, the children were involved in sports activities. The sons enjoyed soccer, while the daughter played softball. Michael complained that his father did not sign him up for basketball or baseball, which he had played before. Courtney likewise complained that she was not permitted to participate in ballet, swimming, or diving activities. The father indicated that he had tried to sign Courtney up for swimming activities at the local public pool but that it had a waiting list; he said that she had not indicated a desire to take dance to him.
Chris kept a journal at school in which he recorded his thoughts about his father. In the journal, Chris commented about his father threatening him, disciplining him, or hitting him, his father caring more for Ms. Rochine than his own children, his father allegedly sexually abusing Courtney, and, at one point, Chris's desire to harm himself or his father because the father would not let the children return to live with the mother. The mother called the school counselor regarding Chris's threats to harm himself or his father; the school *Page 408 
counselor spoke with Chris and informed DHR of her concern for Chris.
Courtney testified that her father treated her differently than he did her brothers. She said that if they all did extra chores around the house, her brothers were paid more money. She also said that her father allowed her brothers to have more prepackaged juice drinks for lunch than she was allowed. When questioned about why she wanted to live with her mother, Courtney said that her father did not treat her nicely and that "he makes me feel like I'm a nobody and that he doesn't love me."
The mother testified that the children were unhappy living with the father. When questioned about why she thought it would be in the children's best interest for her to have sole physical custody, she answered, "I'm going to cry. The most important reason is because that's where they want to be and that's where they've wanted to be all along." She explained that she thought the children needed both a mother and a father and that she was willing to "co-parent" with the father, although she criticized the father as not being able to effectively parent because of his alleged alcohol problems, which had been a major focus of the original divorce trial. The mother also criticized the father for utilizing babysitters too often because of his work duties; however, she admitted that, if she were to have custody, she would require assistance in providing the children transportation and supervision after school while she worked at an outpatient clinic in Birmingham. She testified that she had flexible hours at the clinic; however, she did testify that the job was full-time, i.e., that she was required to work 40 hours per week. She also said that the clinic was willing to work with her to accommodate her obligations as a single parent if she were awarded custody. The mother also complained that the father was difficult to communicate with and that he did not allow her to be involved in decisions regarding the children's medical care. She disagreed with the father's handling of the children's medical care.
The father testified that the children were happy in his home. He said that, after the parties' divorce, the children had not wanted to be in his custody and that they had undergone a difficult adjustment period after the original custody award. However, he explained that Chris had made a rather dramatic turnaround when he failed the seventh grade during his first year in his father's custody. According to the father, once Chris realized he would have to repeat the seventh grade, Chris sought the father's assistance in avoiding that consequence. The father said that Chris had gone to both the morning and afternoon sessions of summer school and had made up the classes he had failed and that, since that time, Chris has done well in school.
The father also denied drinking alcoholic beverages in the presence of the children while at home, although he admitted that he had indulged in alcoholic beverages in the presence of the children on a few occasions while on vacation. He also testified that he often cooked with alcoholic beverages. The father also denied keeping empty bottles of alcohol in a car or in a drawer. He also denied any inappropriate sexual contact with Ms. Rochine; he specifically denied the incident in the van that Courtney described, and, although he admitted he was in bed with Ms. Rochine on the occasion reported by Chris and Courtney, he insisted that he and Ms. Rochine were asleep at the time. The father denied using any type of corporal punishment, including hitting the children with a newspaper or magazine, stating that a psychologist who counseled the family during *Page 409 
the original divorce proceedings had advised against it because the children's behavior was oppositional at that time. He admitted that, on occasion, he may have grabbed the children by the arm to escort them to another room to separate them or to escort them to their own room for a "time out."
Chris's school counselor, Cathy Cantrell, also testified. She said that when Chris enrolled in school both parents spoke with her about concerns they had over his transition from private to public school. Cantrell testified that she noticed that Chris had a "very flat affect," that he looked down at the floor or his feet, and that he did not "interrelate" with the other students. In addition, she commented that his grades were very poor. She testified that she became concerned over things Chris told her and things he wrote in his journal about his relationship with his father. Cantrell testified that Chris seemed alienated from his father, but she said that that the alienation was not caused by the mother. She further commented that Chris and the mother interacted affectionately, but she described the interaction between the father and Chris as stoic, like, she said, men typically relate to one another. Cantrell noted that when the father spoke to Chris in her presence it was in the manner of a directive.
The deposition testimony of Dr. Batchelor indicated that she had determined that the children were affected by parental alienation syndrome ("PAS"), a syndrome in which one parent engages in a campaign to break off or minimize a child's contact with the other parent and to shift the child's perception of that other parent in a negative direction. Dr. Batchelor counseled the children on one day in October 2004, during the pendency of the dependency proceeding. She had had a few interactions with the family on earlier dates, including supervising a visitation exchange and doing an assessment on Courtney to determine whether allegations of sexual abuse could be substantiated.
Dr. Batchelor said that the father, Chris, Courtney, and Michael came to her office on October 22, 2004. According to Dr. Batchelor, she saw her role that day as a mediator to assist the family in improving the relationships between the father and the children. When the family first arrived, Dr. Batchelor invited them in and the children removed their shoes and got comfortable. She noted that the family was laughing, playing, and wrestling around on the floor as a typical family might. However, Dr. Batchelor said that the father had a difficult time directing the children to stand up and begin the counseling session because the children did not listen to him and seemed to have no fear of or respect for the father. She explained that the children, especially Chris and Courtney, were oppositional toward their father and that Courtney, in particular, was extremely disrespectful of the father, chanting over and over during the counseling session that "dad is an idiot."
Dr. Batchelor said that she asked the children what problems they were having at home and what they thought might be necessary to resolve those problems. Courtney, Dr. Batchelor said, repeated a complaint she had had during the original divorce proceeding concerning the father's use of a wooden spoon as a discipline tool. According to Dr. Batchelor, Michael corrected his sister, saying that the father did not use the spoon any more. Michael then lodged a new complaint about the father "thumping" him, which Dr. Batchelor discussed with him. Dr. Batchelor reported that Chris declined to participate in the counseling session.
Dr. Batchelor commented that the mother arrived unannounced and uninvited during *Page 410 
the counseling session. At that time, according to Dr. Batchelor, the children's behavior toward their father became completely disrespectful. She noted that the children began saying horrible things about the father and that the children, especially Chris and Courtney, seemed to be attempting to "outdo" each other. In addition, Dr. Batchelor said that the children became louder and louder during their outburst, so much so that the neighboring office lodged a complaint against her with the building manager. Dr. Batchelor reported that the mother had arrived with a tape recorder. Dr. Batchelor was especially troubled by the mother's lack of concern about the children's inappropriate behavior and her failure to correct that behavior.
Dr. Batchelor outlined the hallmarks of PAS. She noted that, in general, the process is about denigrating the targeted parent and idolizing the other parent. Dr. Batchelor indicated that the Goetsch children, Chris and Courtney especially, exhibited many of the signs of PAS, including being exceptionally negative about the targeted parent, considering the other parent "perfect" while the targeted parent can do nothing right, having the hatred of the targeted parent take on the quality of a litany, showing compliance and cooperation toward adults other than the targeted parent, viewing the targeted parent as the enemy while considering the other parent as the victim, exhibiting a complete lack of concern or compassion for the targeted parent and instead having an exploitative attitude toward that parent, and having a rigid and fixed belief system that is resistant to conditional methods of intervention.
Dr. Batchelor noted that the father was patient with the children and had not been overly critical regarding their behavior, in her presence. She said that, as the targeted parent, he would have to ignore much of the children's behaviors if he wanted to improve the relationship. She stated that the father would require approximately two years to transition the children to an appropriate parent-child relationship. She also opined that it would not be in the children's best interest to place them in the custody of the mother and, in fact, recommended that the visitation with the mother be supervised until it was clear that the mother was supporting the relationship between the father and the children.
On cross-examination during the deposition, Dr. Batchelor admitted that she had counseled all three children only once. In addition, she noted that she had had little contact with the mother and that she had not observed the mother and the children to determine whether the mother was, in fact, attempting to alienate the children from the father. Dr. Batchelor further admitted that certain information she had regarding the relationship between the parents was one-sided, having been supplied by the father. She stated, however, that what she had observed was that the children had become very negative toward the father and that she had based her opinions and recommendations concerning the children on those observations.
The father argues that the mother has failed to prove a material change in circumstances. He focuses in large part on the fact that the circumstances underlying the original custody determination revealed that the children were oppositionally defiant to him and that the mother was encouraging this behavior both before and after the entry of the original custody judgment.[1] The trial court in the present *Page 411 
case, however, was not sufficiently apprised of the facts underlying the original custody judgment. As is typical in any modification case, the trial court refused to hear any evidence relating to acts occurring or circumstances existing before the entry of the original custody judgment. See, generally,Woodham v. Woodham, 539 So.2d 293 (Ala.Civ.App. 1988). Thus, the record contains very little evidence regarding the children's psychological diagnoses and nothing of the mother's.
Based on the evidence presented to it, the trial court was free to draw its own conclusions about the fitness of the parents in this case; the conclusions it drew were unfavorable to the father. The evidence in the record, conflicting as it was, was sufficient to have led the trial court to make the findings of fact that would be necessary to support its ultimate custody judgment. The children's complaints about the father, although similar to those raised in the original divorce trial, are generally based on the father's conduct since he was awarded custody. Although we agree that some of the children's testimony is vague, the trial court had ample evidence from which to conclude, as it must have, that the father's parenting behavior has created anxiety and fear in the children, has led to Chris's having thoughts of harming himself or his father, has caused Courtney to lack self-esteem, and has not created an atmosphere in which the children will grow and mature into well-adjusted, healthy adults. In contrast, the trial court could have determined from the evidence that the mother cares deeply for the children, that she provides a warm and nurturing atmosphere for the children, and that she will put the children's needs, be they emotional, social, recreational, or educational, ahead of her own. Thus, the trial court could have concluded that the mother had shown that a material change of circumstances had occurred on the basis that the children have been subjected to emotional abuse that has damaged them and that a change in custody to the mother would materially promote the children's best interests and outweigh any disruptive effect caused by the change in custody. Constrained as we are by the ore tenus presumption, we must affirm the trial court's custody modification because one view of the conflicting evidence presented supports it. Ex parte Bryowsky,676 So.2d 1322, 1324 (Ala. 1996) ("The trial court is in the best position to make a custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented oretenus before the trial court in a custody hearing.").
 II. The Child-Support Issue
The father next argues that the trial court erred by ordering him to pay $7,000 per month in child support. The father's monthly income is $25,382. The mother's income is $8,000 per month. Their combined income clearly exceeds the uppermost limits of the Child Support Guidelines provided in Rule 32, Ala. R. Jud. Admin.
 "When the combined adjusted gross income exceeds the uppermost limit of the child support schedule, the amount of child support awarded must rationally relate to the reasonable and necessary *Page 412 
needs of the child, taking into account the lifestyle to which the child was accustomed and the standard of living the child enjoyed before the divorce, and must reasonably relate to the obligor's ability to pay for those needs."
Dyas v. Dyas, 683 So.2d 971, 973-74
(Ala.Civ.App. 1995) (footnote omitted), aff'd but remandedwith instructions, 683 So.2d 974 (Ala. 1996).
The father specifically argues that the record is devoid of evidence concerning the reasonable and necessary needs of the children. Although the record does reveal that the children are involved in extracurricular activities, the costs of those activities are not outlined. In fact, the mother did not testify concerning what her expenses would be if she were awarded custody; she only stated that she would need to employ someone to provide after-school care for the children. The only expenses the mother testified to were those that were necessary to her employment, which had been deducted before determining her monthly gross income, and the amount of her house payment, which had been approximately $1,250 per month but which had increased to $1,650 per month. The record does not contain evidence concerning the children's reasonable and necessary needs, and, therefore, we must reverse the trial court's $7,000 child-support award and remand the cause for the trial court to take the necessary evidence and to award an appropriate amount of child support.
We note that the record does indicate that the children's former private-school tuition was $25,000 per year. The mother testified that she would reenroll the children in private school were she awarded custody. However, the record reflects that the children were not enrolled in private school by the mother immediately upon her assuming custody because the school did not have any openings. Thus, the award of child support cannot have been based upon the cost of private-school tuition because that tuition was not an actual expense incurred on behalf of the children. If the mother has since enrolled the children in private school, the trial court may, upon proof of the amount of tuition, base its award of child support, in part, on that expense.
Within his argument that the child-support award should be reversed, the father states that the trial court's requirement that he purchase a $750,000 life insurance policy is also in error. However, in contravention of Rule 28, Ala. R.App. P., he cites no authority for this argument. Nor does he develop it. Generally, whether to require a parent to maintain a life insurance policy for the benefit of his minor children is within the sound discretion of the trial court. See Wyliev. Wylie, 794 So.2d 1174 (Ala.Civ.App. 2001). The father's bald statement that the trial court abused its discretion in requiring him to secure a policy is not sufficient basis for finding that the trial court erred in establishing that requirement.
 III. The Enforcement Issues
The father's final argument is that the trial court erred by failing to enforce certain provisions of the divorce judgment with which, he contends, the mother has failed to comply. The father introduced as an exhibit a list of personal property that had been awarded to him in the original divorce judgment. He testified that those items had not been returned to his possession by the mother. The mother, when asked about those items, stated that, "to the best of her knowledge," she did not have those items in her possession. The father also testified that the mother had been ordered to provide him proof that she had terminated the life insurance policy *Page 413 
she had taken out on his life without his knowledge before the divorce; according to the father, the mother had failed to provide him that proof. However, he admitted that he had never asked the mother about the policy or requested any proof of its termination and that he had no proof that the policy was still in force. Neither the attorney for the father nor the attorney for the mother questioned the mother about the insurance policy.
The father does not appear to argue that the mother should have been held in contempt for her failure to comply with provisions of the original divorce judgment. Instead, he seeks to have us reverse the trial court's judgment because it fails to enforce the provisions of the divorce judgment. A trial court has the inherent power to enforce its judgments "and to make such orders and issue such process as may be necessary to render [the judgments] effective." Dial v. Morgan,515 So.2d 14, 15 (Ala.Civ.App. 1987); see also King v. King,636 So.2d 1249, 1254 (Ala.Civ.App. 1994). A trial court may use that power to enforce the provisions of its divorce judgment to award one party the value of items not returned by the other party in violation of a divorce judgment. See Jordan v.Jordan, 600 So.2d 332 (Ala.Civ.App. 1992), overruledon other grounds by Stack v. Stack, 646 So.2d 51
(Ala.Civ.App. 1994). However, a trial court is not required to use its power to enforce a judgment unless it has determined that the judgment requires enforcement. The mother's testimony that she did not have any of the personal property awarded to the father in her possession must have convinced the trial court that those items had either been returned to the father or, through no fault of the mother, were simply missing. "The determination of whether a party has failed to abide by the terms of a divorce [judgment] . . . is a matter committed to the sound discretion of the trial court." Jordan,600 So.2d at 333. The father has not shown that the trial court abused its discretion in failing to enforce the provisions of the original divorce judgment regarding the personal property that he was awarded.
However, the trial court could not have determined that the mother canceled the policy of insurance that she had impermissibly taken out on the father's life. The mother never testified regarding the cancellation of that policy. The original divorce judgment required that the mother produce proof that the policy had been canceled in compliance with the judgment. The mother failed to produce that proof despite the father's being entitled to it. Accordingly, the trial court abused its discretion by not requiring that the mother provide the requisite proof of cancellation.
 IV. Conclusion
In conclusion, we affirm the trial court's judgment insofar as it awarded physical custody of the children to the mother. However, we reverse the judgment insofar as it ordered the father to pay $7,000 per month in child support. We also reverse the judgment insofar as it failed to enforce the original divorce judgment by not requiring the mother to produce proof that she canceled the policy of insurance she had taken out on the father's life. Insofar as it failed to enforce the provisions of the divorce judgment relating to the award of personal property to the father, however, the trial court's judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
[1] The father has requested that we take judicial notice of the record in Goetsch I. See Morrow v. Gibson,827 So.2d 756, 762 (Ala. 2002) ("`This court takes judicial notice or has judicial knowledge of contents of it records with reference to its previous consideration of litigation presently before it.'" (quoting FDIC v. Equitable Life AssuranceSoc'y of the United States, 289 Ala. 192, 194,266 So.2d 752, 753 (1972))). Although we have briefly reviewed the record in Goetsch I, we have not used the evidence reflected in that record, which was unavailable to the trial court in the modification trial, to review the trial court's modification judgment. *Page 414