THOMAS, Judge.
R.D.F. ("the father") and R.J.F. ("the mother") are the parents of four children: N.F., Jon.F., A.F., and Jos.F. The parties were divorced in 2013; the divorce judgment awarded sole custody of the oldest *833 child, N.F., to the father,[1] awarded the mother visitation with N.F., awarded joint custody of the three younger children to the parents, and required the father to pay child support to the mother; the mother's custodial periods with all four children are quite similar to standard visitation, i.e., every other weekend and alternating Tuesday and Thursday evenings. In July 2015, the mother filed a verified complaint in the Morgan Circuit Court ("the trial court") in which she sought to have the father held in contempt and sought to modify her custodial periods with the children. The father answered the mother's complaint and counterclaimed, seeking to reduce the mother's custodial periods with N.F. by 1 day each custodial weekend and with the younger children by 30 minutes on those Sundays that the mother exercised her custodial periods; the father also sought the termination of his obligation to pay child support to the mother. In December 2015, the father moved to suspend the mother's overnight custodial periods with N.F. and to reduce the mother's daytime custodial periods with N.F. to one-half day. Although the trial court held a hearing on the father's motion in February 2016, it did not address the motion until its issuance of the final judgment.
The trial commenced on June 14, 2016, and continued through June 17, 2016; however, the trial was not completed until October 28, 2016. The trial court entered a judgment on May 9, 2017, in which it held the father in contempt for certain actions, modified custody by awarding the mother sole legal and sole physical custody of all four children, and ordered the father to pay child support in accordance with Rule 32, Ala. R. Jud. Admin. The father filed a postjudgment motion, which was denied by operation of law, see Rule 59.1, Ala. R. Civ. P. (providing that the failure to render an order on a postjudgment motion within 90 days after its filing results in the automatic denial of the motion), and then filed a timely appeal. On appeal, the father challenges the modification of custody and the award of child support.
The father first argues that the trial court lacked the authority to modify custody of the children because, he says, the mother sought only an increase in her custodial periods and, therefore, he asserts, he did not have notice that the trial court would consider a full modification of the existing custody arrangement. In her complaint, the mother sought a change to the parties' custodial arrangement, requesting additional time with the children, and utilized language closely mirroring that found in Ex parte McLendon, 455 So.2d 863, 865-66 (Ala. 1984) (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala. Civ. App. 1976) ), regarding the burden for a change in custody;[2] in his counterclaim, the father sought to reduce the mother's custodial periods with all the children, but especially with N.F. However, at trial, the mother testified that she was asking the trial court to "flip the schedule" or "to give [her] what [the father] now has and give him what [the mother has]."
The father's attorney objected to the mother's testimony, stating that the mother had asked for only "additional custodial *834 time," not a modification of custody. The mother's attorney indicated that he did not think that the mother had been required to state in her pleadings what the exact custodial arrangement should be, and the trial court agreed, indicating that the mother could testify about what custodial arrangement she thought would be best for the children. The mother stated that she was not seeking sole physical custody, but, when questioned a second time about what she desired, the mother again testified, this time without objection, that she wanted the trial court to "flip the custody" and that she was "asking for more custodial time." In addition, the children's guardian ad litem filed her report before the beginning of the trial in this matter; her recommendation was to award sole physical custody of the children to the mother, indicating that the guardian ad litem was aware that the parties were litigating the proper custodial arrangement for the children. Notably, although his counsel cross-examined the guardian ad litem about the report at the close of the trial, the father did not object to the admission of the guardian ad litem's report or her testimony indicating that she recommended a modification of custody.
"It has been said by the Supreme Court of this state that in a custody proceeding the court 'does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other, or indeed against anyone. [The court] acts as parens patriae to do what is best for the interest of the child. [The court] is not adjudicating a controversy between adversary parties, to compose their private differences. [The court] is not determining rights as between a parent and child, or as between one parent and another.' Cleckley v. Cleckley, 250 Ala. 78, 33 So.2d 338[ (1948] ) ; Ex parte White, 245 Ala. 212, 16 So.2d 500 [ (1944] ). Any matter affecting the rights, interests or welfare of the ward is within the peculiar jurisdiction and discretion of the court. Stephens v. Stephens, 253 Ala. 315, 45 So.2d 153 [ (1950] )."
Leigh v. Aiken, 54 Ala. App. 620, 623, 311 So.2d 444, 447 (Civ. App. 1975).
In addition, our supreme court has explained:
"The circuit court's jurisdiction to [decide custody] is derived from the principles of equity; where a child is physically present within the jurisdiction of a circuit court in this state, the court has inherent authority to act to protect the welfare and best interests of the child. [ Ex parte] Handley [, 460 So.2d 167 (Ala. 1984] ). A party need not specifically invoke the circuit court's inherent jurisdiction; rather, any pleading showing on its face that the welfare of a child requires an order with respect to its custody and support is sufficient to invoke the jurisdiction of the circuit court to settle the matter. Handley. Once the circuit court's jurisdiction is thus invoked, any matter affecting a child may become the subject of its adjudication. Handley."
Ex parte Lipscomb, 660 So.2d 986, 989 (Ala. 1994).
Furthermore, Ala. Code 1975, § 30-3-152(a), requires that a trial court tasked with determining the custody of a child consider joint custody but specifically states that a trial court "may award any form of custody which is determined to be in the best interest of the child." A review of the record indicates that most of the evidence presented concerned the respective parenting abilities of the parties and what amount of parenting time each party should have. Based on the foregoing authorities, we conclude that the question of what custody arrangement would serve the best interest of the children was litigated *835 by the parties, and we find no basis for a conclusion that the trial court exceeded its authority or proceeded to modify custody without notice to the father that a modification of custody was requested.
A parent seeking modification of any type of custody arrangement must show a material change of circumstances giving rise to a need for a change of custody. Watters v. Watters, 918 So.2d 913, 916 (Ala. Civ. App. 2005) ; Means v. Means, 512 So.2d 1386, 1388 (Ala. Civ. App. 1987). A material change of circumstances is a change in the circumstances of the parties " 'such as to affect the welfare and best interest of the child or children involved.' " Watters, 918 So.2d at 916 (quoting Ponder v. Ponder, 50 Ala. App. 27, 30, 276 So.2d 613, 615 (Civ. App. 1973) ). The alleged material changes must "affect [ ] the best interest and welfare of the child such that a change in the existing custodial arrangement [is] warranted," and mere tangential effects on the child are not sufficient to make changes in circumstances material. Watters, 918 So.2d at 916.
We note that, in this case, the parties shared joint custody of the three younger children but that the father had sole custody of N.F. Thus, the trial court was required to apply different standards to the custody modification sought by the mother. Regarding N.F., the mother was required to present evidence indicating that a change in N.F.'s custody would materially promote his welfare. See Ex parte McLendon, 455 So.2d at 866-67. Of course, a parent seeking modification of a joint-custody arrangement is not required to meet the standard set out in Ex parte McLendon. See Watters, 918 So.2d at 916 ; Means, 512 So.2d at 1388. Thus, the mother was not required to show that the three younger children's best interest would be materially promoted by a change in custody but only that a modification of custody would serve their best interest. See Ex parte Couch, 521 So.2d 987 (Ala. 1988).
Finally, we note that it is beyond settled that our review of a trial court's custody determination made after consideration of oral testimony is limited.
" ' " ' "Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, ... and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow...." ' "
" '[ Ex parte Bryowsky,] 676 So.2d [1322,] 1324 [ (Ala. 1996] ) ; see Lamb [v. Lamb], 939 So.2d [918,] 922 [ (Ala. Civ. App. 2006] ) ; see also Ex parte Foley, 864 So.2d 1094, 1099 (Ala. 2003) ("[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow." (citation omitted) ).' "
Irions v. Holt, 156 So.3d 956, 962 (Ala. Civ. App. 2014) (quoting Ex parte Blackstock, 47 So.3d 801, 805 (Ala. 2009) ).
The evidence presented at trial indicated that the parents lack the ability to coparent the children. Although the father repeatedly blamed the mother for the problems of the children and the inability of the parents to communicate effectively, much of the evidence presented at trial supports the conclusion of both the guardian ad litem and the trial court that the main impediment to coparenting was the father.
*836 For example, the father insisted at trial that the mother suffers from either bipolar disorder or borderline personality disorder ; however, no objective proof of either diagnosis appears in the record. The father reported to N.F.'s medical providers that N.F. had a family history of one or the other disorder and had remarked to the children that their mother is "a borderline." As the trial court described in its judgment, the evidence presented at trial indicated that the father's relationship with the mother is one "in which he is hostile, harassing, intimidating, condescending, and demeaning." The electronic-mail messages from the father to the mother contained in the record were routinely belittling and argumentative, and they demonstrate an extreme lack of flexibility and a refusal to cooperate with the mother. Furthermore, the record is riddled with indications of the contempt the father holds for the mother, whom, he testified unequivocally, he does not respect.
N.F. testified outside the presence of the parties on two separate days.[3] The 13-year-old child was clearly conflicted and confused about which parent was telling him the truth. On the whole, N.F. testified that he desired to spend more time with the mother, that the mother was a more lax disciplinarian than the father, and that both parents provided for his needs and the needs of the three younger children. N.F. explained that the father made him feel badly about himself because the father had described N.F. as having "special needs," that the father "needs [N.F.] to be near perfect," and that the father "was always right." According to N.F., the mother spent time talking to him about his feelings and was supportive of him; he commented that she would tell him that everyone makes mistakes and did not make him feel "abnormal." N.F. also recounted that the father spoke ill of the mother by referring to her by her alleged diagnosis ("a borderline") or by implying that she was crazy ("that is what happens when you marry a crazy person") but said that the mother seldom spoke ill of the father. N.F. explained that he thought that he had been manipulated by the father into believing things about his mother that were not true; he admitted that he had, at first, wanted to reduce the time he spent with the mother, but, he said, he now wanted to spend more time with her. Most disturbing, however, was N.F.'s second day of testimony, when he recounted that his father had learned that N.F.'s earlier testimony was more favorable toward the mother than the father liked and had berated N.F. in front of the three younger children for "taking her side."
In addition, N.F. indicated that the father also spoke ill of the guardian ad litem to the children. According to N.F., the father had said that the mother and the guardian ad litem were determined to take *837 the children away from him. The guardian ad litem included as exhibits to her report electronic-mail messages sent by the father to her. In one, in which the father requests that the guardian ad litem move the trial court for the suspension of the mother's visitation with N.F., the father stated:
"Now, [N.F.] states that he is cooperating with his mother and [the guardian ad litem] to live with his mother. Clearly, this option would be [N.F.'s] death knell. If we had the cooperation of [the] guardian ad litem, [the] father and [the] clinician, then this mess could very well have been avoided."
In another message, the father stated the following:
"This process ... has not produced the results I was hoping to achieve.... Nearly four months have elapsed since you and I first visited in Hartselle[;] I've spent thousands of dollars just since that day in this never-ending money-pit of a process and have garnered, frankly, nothing but more debt. I hope you don't think it unfair of me to ask, but when should I expect to see a return on my investment with you?"
The guardian ad litem indicated that she was not entirely sure what the father meant by "return on my investment," but she noted that the messages "serve as evidence of the father's entire[ly] disrespectful and noncompliant attitude toward [her] and the process as a whole."
The record further demonstrates that the parties have a serious disagreement about N.F.'s alleged mental illness and its treatment. As the trial court's judgment recounts, N.F. has seen 11 mental-health professionals since 2010. He has been prescribed 11 different medications, including Prozac, Zyprexa, and Lamictal. According to some of the father's testimony and certain documentary evidence, the father believes that N.F. has some form of emotional disturbance, up to and including the beginnings of borderline personality disorder or bipolar disorder, "like his mother." N.F. himself admitted that he "get[s] mad kind of quickly," but, he said, he did not "think that it is worse than any other teenager." The record contains certain progress notes from Tamara Pellant, a licensed professional counselor who treated N.F., and a psychological examination performed on N.F. by Dr. Lois Pope. Both professionals indicate that N.F. suffers from "rages," and Dr. Pope diagnosed N.F. with "cyclothymic disorder," which Dr. Pope testified was "fluctuating periods of anger, depression, or anxiety."
The mother indicated that she has concerns about the medications N.F. has been prescribed, but when she requested of the father to be included in N.F.'s medical appointments, the father informed her that she could make her own appointments, at her own expense, to speak with those medical professionals. The mother does not believe that N.F. suffers from any severe mental illness. Although she agrees that N.F. might have problems handling his emotions at times, she says that she considers him to be a normal boy adjusting to the changes of adolescence. N.F. testified that he thought that the medication and counseling helped him.
Further recitation of the evidence is unnecessary because the trial court's judgment more than adequately explains the concerns that prompted its decision to modify custody of the children. Chief among the reasons for the award of sole custody to the mother was what the trial court perceived to be the emotional harm that had resulted, and that could result in the future, from the father's behavior toward the mother and toward N.F. in the face of N.F.'s challenge to the father's campaign against the mother. This reason *838 is not, as the father attempts to characterize it, merely based on an erosion of the father's relationship with N.F. or issues between the parties, which, the father contends, are not proper bases for modifying custody. See Pullum v. Webb, 669 So.2d 925, 927 (Ala. Civ. App. 1995) (stating that the "erosion of the relationship between the [custodial parent] and the children is insufficient to support a change in custody").
In the judgment, the trial court described the father's behavior during the pendency of the proceedings as "increasingly irrational and alarming" and noted that it was "causing emotional damage to the children." The trial court concluded that the father "does not always act in the best interest of the children, but instead acts in his own interests." Based on those findings and conclusions, the trial court determined that the mother had demonstrated a material change in circumstances, that a modification of custody would be in the best interest of the three younger children, and that a modification of N.F.'s custody would "promote [his] welfare ..., particularly his emotional and psychological welfare, and that the benefits of such change in custody substantially outweigh any disruptive effects." See Goetsch v. Goetsch, 990 So.2d 403, 411 (Ala. Civ. App. 2008) (affirming a modification of custody where the evidence supported a conclusion that the father's parenting behaviors were negatively affecting the children). Mindful of our standard of review, we conclude that the evidence of record supports the trial court's conclusions and supports the modification of the children's custody under both the best-interest and the McLendon standards.
The father next argues that the trial court erred in modifying his child-support obligation for several reasons. First, the father argues that his due-process rights were violated because, he says, he was not aware that his child-support obligation might be modified. Indeed, the mother did not request a modification of child support; the father did. Thus, the issue of child support was at issue before the court. As we explained above, our supreme court has explained that "any pleading showing on its face that the welfare of a child requires an order with respect to its custody and support is sufficient to invoke the jurisdiction of the circuit court to settle the matter." Ex parte Lipscomb, 660 So.2d at 989. In light of the fact that the trial court was tasked with determining the proper custodial arrangement for the children, we conclude that the trial court had the authority to consider an award of child support based on the custodial award made.
The father also attacks the substance of the child-support award. He contends that the judgment, insofar as it ordered him to pay child support, should be reversed because no child-support income affidavits are contained in the record.[4] Although that is true, the parties each testified about their respective incomes, and the child-support-guideline form completed by the trial court reflects the income to which each parent testified.[5]
*839 "We have not, in every instance, reversed a trial court's child-support judgment simply because the requisite forms were not contained in the record. See Rimpf v. Campbell, 853 So.2d 957, 959 (Ala. Civ. App. 2002) ; Mosley v. Mosley, 747 So.2d 894, 898 (Ala. Civ. App. 1999) ; and Dismukes v. Dorsey, 686 So.2d 298, 301 (Ala. Civ. App. 1996) (stating that this court need not reverse a child-support award even though the required forms are not in the record where the record 'clearly indicat[es] that the award comports with the evidence regarding the parties' incomes'); see also Devine v. Devine, 812 So.2d 1278, 1282 (Ala. Civ. App. 2001)."
Dunn v. Dunn, 891 So.2d 891, 896 (Ala. Civ. App. 2004). Thus, we decline to reverse the judgment insofar as it awards child support on the basis that the income affidavits of the parties are missing from the record.
However, the father further argues that the trial court made an error in the computation of the child-support obligations of the parties. Indeed, it appears that the trial court improperly deducted from the mother's child-support obligation the $33.33 monthly health-insurance premium, which, the parties testified, the father paid. Thus, the trial court erred in its calculation of child support, and we reverse the judgment insofar as it ordered the father to pay $1,409 per month in child support. The trial court should properly recalculate the father's child-support obligation on remand.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Thompson, P.J., and Pittman, Moore, and Donaldson, JJ., concur.

The divorce judgment is inconsistent, awarding the father sole physical and sole legal custody of N.F. yet also stating that the parties are to share joint legal custody of N.F.

The complaint states that "there has been a material change in circumstances such that an award of additional custodial time of the party's minor children to the mother would materially promote the welfare of said minor children so as to overcome any disruptive effects that may occur from uprooting the minor children from their current environment."

We note that the three younger children testified before the trial court in camera and that their testimony was not recorded. Typically, "when a trial court bases its judgment upon ore tenus evidence that is not contained in the record on appeal, that judgment comes to this court clothed with a conclusive presumption that the absent testimony supports the judgment." Terry v. Terry, 660 So.2d 996, 998-99 (Ala. Civ. App. 1995). "This court repeatedly has stated that 'where there was evidence before the trial court, and not before [the appellate court], which may have influenced [the trial court] at arriving at the conclusion it reached,' we will not disturb that conclusion." Jennings v. Jennings, 892 So.2d 437, 439 (Ala. Civ. App. 2004) (quoting Eaton v. Shene, 282 Ala. 429, 430, 212 So.2d 596, 598 (1968), and affirming the denial of a petition to modify custody where in camera interviews of the children were not recorded). Because most, but not all, of the evidence presented in this matter pertained to the custody dispute relative to N.F., we will discuss the evidence and consider the appeal on the merits.

The record reflects that the father, at least, had filed a child-support income affidavit. The mother's counsel indicated his intent to file one, as well, and the father's exhibit list listed as an exhibit the mother's income affidavit.

The father notes that testimony from N.F. on the final day of trial in October 2016 indicates that the mother had changed employment and increased her income, and he complains that, as a result, the trial court did not have the mother's current income when it calculated the child-support obligation. N.F.'s testimony was that the mother's new employment "is higher paying. She is -- what do they call it? It is a higher pay, and she doesn't have to be away from home as much." Counsel for the mother objected on the ground that anything N.F. said about his mother's new employment would be hearsay or not based on firsthand knowledge; the trial court did not specifically rule on the objection, but it could have declined to consider N.F.'s general testimony about the mother's increase in income on those bases. See Rule 602 and Rule 802, Ala. R. Evid.; see also Spradley v. State, 128 So.3d 774, 786 (Ala. Crim. App. 2011). There is no other evidence indicating that the mother's income was not the amount to which she testified.