[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 295 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 296 
Taquisha Brooks ("the mother") and Jonathan Brooks ("the father") were divorced on April 25, 2002, by a judgment of the trial court that expressly incorporated the parties' separation agreement and, among other things, awarded the mother "primary physical custody of Redonte Toles ("the child"), the parties' minor child. The father was awarded visitation. The parties' separation agreement also provided:
 "Either party who violates this Agreement shall upon judicial finding of such violation be responsible for payment of all costs, expenses, attorney fees, and incidental and consequential damages made necessary by such violation."
(Emphasis and bold typeface omitted.)
On June 26, 2006, the father filed a verified petition seeking to modify custody and to hold the mother in contempt, in which he alleged, among other things, that he had been denied visitation with the child and that the mother had failed to pay the indebtedness on the parties' 2001 Kia Sephia automobile ("the vehicle"), as ordered by the trial court. The petition sought full legal and physical custody of the child and child support, a finding of contempt against the mother regarding the vehicle, an award of reasonable costs and attorney's fees, and any other relief to which the father was entitled.
The mother answered the petition and denied the father's allegations. On November 20, 2006, the trial court heard disputed, oral testimony from three witnesses and admitted 15 exhibits.
On December 14, 2006, the trial court entered a judgment awarding the father sole legal custody and physical custody of the child and awarding visitation to the mother. That judgment also found that the mother had breached the parties' separation agreement and ordered the mother to pay to the father $1,500 for his attorney's fees and $252 for court costs. The mother timely appealed.
In paragraph 14 of its December 14, 2006, order, the trial court stated:
 "That [the father] is due to be awarded a judgment against [the mother] for her failure to reimburse him for monthly payments on the [vehicle]. Counsel for [the father] shall have 10 days [from] the date of this Order [to] submit the final amount owing and unpaid . . . and the Court by separate order will enter a judgment in favor of [the father] in that amount." *Page 297 
Because this provision rendered the trial court's judgment nonfinal, on February 7, 2008, this court issued an order reinvesting the trial court with jurisdiction for seven days and directing the trial court to determine whether to make its December 14, 2006, judgment final. On February 11, 2008, the trial court entered an order finding that the father had not submitted the requested information regarding the balance owed on the vehicle to the trial court within 10 days; therefore, the trial court awarded no money to the father on his claim regarding the balance owed on the vehicle.
On appeal, the mother argues that the father did not meet his burden under Ex parte McLendon, 455 So.2d 863
(Ala. 1984), and, therefore, that the trial court improperly modified custody. She also argues that the trial court improperly modified custody based upon the parties' visitation disputes. The mother further asserts that the trial court exceeded its discretion in awarding the father attorney's fees and costs.
 I. Facts
The parties were divorced on April 25, 2002. The judgment of divorce expressly incorporated the parties' separation agreement, which, among other things, provided:
 "CUSTODY AND CHILD SUPPORT. Both parties shall have Joint legal custody of the minor child with the [mother] having primary physical custody of the minor child. The [father] shall have reasonable visitation with the minor child as follows: Every second and forth [sic] weekend from 10:00 a.m. on Saturday to 7:00 p.m. on Sunday. In odd numbered years, on Christmas from 9 a.m. until 1 p.m. the following day. In even numbered years, on Christmas Eve from 5 p.m. until 5 p.m. Christmas Day. In even numbered years, on Thanksgiving Day commencing at 9:00 a.m."
(Emphasis and bold typeface omitted.)
As noted earlier, the parties also included the following provision regarding costs and attorney's fees in the separation agreement:
 "Either party who violates this Agreement shall upon judicial finding of such violation be responsible for payment of all costs, expenses, attorney fees, and incidental and consequential damages made necessary by such violation."
At the November 20, 2006, hearing in this matter, the trial court heard disputed, oral testimony from the father, the mother, and the father's current wife, Jawandalyn Moore Brooks ("Wanda"). The disputed, conflicting testimony is summarized below.
 A. Testimony of the Father
The father's testimony indicated the following. The father and his current wife, Wanda, live in a three-bedroom house in Montgomery. They have no children together, and there are no other persons living in their house. The father pays $350 rent per month and also pays for the utilities. The father is employed by J.R. Smith Manufacturing Company, earns $17.95 an hour, and works approximately 40 hours per week.
The father has two other children. The father's oldest child is 18 years old and lives in Detroit, Michigan. The father also has a 10-year-old son who lives in Autaugaville. The father stated that he did not know the 10-year-old child's address but that he knew where that child lived.
The father testified that he had only seen the child at issue in this case "no more than three times" in "basically a year and a half." In June 2006, the father's oldest child visited from Detroit, and on that occasion the mother brought the parties *Page 298 
child to the father's house for visitation. The parties child has also traveled to Florida with Wanda and her relatives.
The father testified that the child has allergies that require treatment, although he did not know whether the child was currently being treated for his allergies. The child is covered under the father's family plan medical insurance. Although the child has been covered by that medical insurance for six years, there has never been a claim made for the child on that insurance.
The father testified that he had previously purchased some clothing for the child. He stated that in 2004 he purchased "gloves, tees, white tee shirts, [and] sportswear" for the child from a Kohl's department store. The father also testified that he purchased socks and sleep-wear for the child. The father stated that he will not permit the child to take clothing the father has purchased to the mother's house because, the father said, when the child arrives at his home, the child's clothes are dirty and Wanda must wash them.
The father testified that he has had occasion to be concerned with the child's grades and that the child has had problems in school. The evidence indicated that the child had done poorly in, and had even failed, several classes in the fourth and fifth grade. The father testified that he has offered, but has not been allowed, to assist the child with his homework. Although the father initially claimed that the mother had not discussed with him the child's grades, he later admitted that the mother and he had, in fact, discussed the child's problems with school. The father also admitted that he had not offered any tutorial program or service to the child. B. Testimony of Wanda
Wanda testified that she and the father have been married approximately one and one-half years. She testified that she is aware of the child's medical needs and has witnessed the child having allergy attacks. She stated that she took the child to the doctor's office on one occasion. However, on that occasion the doctor did not have the proper insurance information regarding coverage for the child. After Wanda contacted the mother on that occasion, the mother instructed her to return the child to the mother's house, and the mother told Wanda that she would take the child to the doctor.
Wanda said that, normally, when the child visits, "his allergies are flared up." She stated that she or the father then have to purchase Benadryl allergy medication because, according to Wanda, the mother does not send any medication for the child.
Wanda testified that she had seen the child "numerous" times — approximately 15 times per year during visitation periods — since she had met the father. She claimed that the father had seen the child only five times in the past year and a half.
Wanda testified that the child had not visited the father every second and fourth weekend from 10 a.m. on Saturday to 7 p.m. on Sunday. She also testified that the child had not visited the father on Thanksgiving or on Christmas.
Wanda claimed that, when the child comes to visit, the clothes in his bag are generally dirty and worn. Wanda testified that, when the child arrives for a visit, his clothes generally "smell of — I don't know — it's some kind of nicotine smoke or something, because that's why I always wash them."
 C. Testimony of the Mother
The mother testified that her name is Taquisha Toles Brooks but that she uses her maiden name — Toles. The mother testified that she currently lived in Prattville *Page 299 
with the minor child and her two other children: a 14-year-old son and a 3-year-old daughter. The children love one another. The mother does not consider her home to be an unhealthy or unwholesome environment. At the time of the hearing in this matter, the mother worked 40 hours per week as a nurse for Oxford Health Care; she worked from 8:00 a.m. until 4:00 p.m., five days a week. She also worked as a private nurse every other weekend.
The mother testified that the child suffers from allergies for which he had been prescribed medication. She stated that she regularly takes the child to the doctor. She also testified that, on a previous occasion, she had taken the child to the emergency room and he had received treatment for a problem with his sinuses. Although the mother knew the child suffered from allergies, she could not recall the specific diagnosis.
The mother testified that, shortly before the hearing in this matter, the child had started taking prescription medication for his allergies, although the mother did not recall the name of the medication. According to the mother, the prescription was to be refilled "whenever needed," with three refills available; the instructions for dispensing the medication are "take at night when it's needed."
The mother testified that the doctor had also instructed her to give the child the nonprescription medications Claritin or Benadryl for his allergies. The mother testified that she had sent medication in the child's bag to the father's home on several occasions. She also testified that she had spoken with the father and had explained when to give the child his medication and what dosage the child was to receive.
The mother testified that she had moved three times since the parties' divorce. She claimed that the father knew her address because, she said, each time she moved the father had traveled to her house to pick up the child. The mother testified that the father knew her current address because, she said, they had discussed the matter and she had informed him of her address.
The mother testified that the father had seen the child several times, including times when visitation was not scheduled or "it was not his weekend." Additionally, the mother testified that, during the summer, the child had stayed with the father for several weeks at a time. The mother provided several examples of the father's visitation with the child beyond the scheduled visitation. The mother also stated that, before he remarried, the father had allowed the child's half brother who lived with the mother to visit when the child visited. She stated that, after his remarriage, however, the father informed the mother that he would no longer be able to take responsibility for the half brother because the half brother was not his child.
The mother testified that she has never refused to allow the father to visit the child. The mother testified that sometimes, on the weekend, the child would call the father, but the father would not answer the telephone. On other weekends, she said, the father would not visit the child, saying that he would claim that was "going to a car show or to the track or he was going out of town, he's going to Atlanta, or so forth."
The mother testified that when the father's oldest child had last visited, the parties' child stayed with the father for two or three weeks, as well as an additional weekend. The mother estimated that the father had seen the child seven or eight times during 2006.
Ultimately, the mother conceded that she had not precisely followed the visitation *Page 300 
schedule outlined by the parties' separation agreement. However, the mother testified that there had been visitation outside and beyond the scheduled visitation and that the father had been "getting [the child] more than he was supposed to on the agreement." The mother stated that the child had visited the father on Thanksgiving in 2004 and that she had allowed the father to keep the child during Christmas of 2004, which is outside the scheduled visitation, but she admitted that she had not allowed visitation during Christmas of 2005. She testified, however, that the father had seen the child at the mother's house during that Christmas.
The mother testified that the child is covered by the Medicaid "All Kids" insurance program. The mother testified that she prefers to use the Medicaid insurance program rather than the father's insurance plan because the Medicaid copay is lower, and she said that when she told the Medicaid staff that the child was covered by the father's insurance plan, the Medicaid staff instructed her not to use the father's insurance plan. The mother testified that, as she was instructed by the Medicaid staff, she has not used the father's insurance plan.
The mother denied that she had sent the child to the father's house with dirty clothes. The mother testified that Wanda would wash the child's clothes because the father would extend the duration of the child's visits even though the child had no additional clean clothes. She testified that the father would call and ask her to bring clean clothes and then would call back to say it was unnecessary for her to bring clothes because Wanda had agreed to wash the clothing the child was already wearing.
 II. Standard of Review "When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: `"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong. . . ."'"
Ex parte Farm, 810 So.2d 631, 633 (Ala. 2001) (quotingEx parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting in turn Phillips v. Phillips, 622 So.2d 410, 412
(Ala.Civ.App. 1993)). However, when the question presented on appeal is one of law, the ore tenus rule has no application. Ex parte Perkins, 646 So.2d at 47. Likewise, there is no presumption of correctness regarding the trial court's application of the law to the facts. Amie v.Conrey, 801 So.2d 841, 846 (Ala.Civ.App. 2001). This court reviews questions of law de novo. Alabama State Bar v.Caffey, 938 So.2d 942, 945 (Ala. 2006).
 III. Analysis A. Custody Modification [6-8] This court has stated: "[T]he `changed circumstance doctrine' [i.e., the basic principle that a child's custody should not be changed unless there is a strong showing that the change is necessary,] is a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child's healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought *Page 301 
abought by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned."
Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App. 1976). The McLendon test for a change of custody after custody has been awarded in a divorce judgment requires that the noncustodial parent seeking a change in custody must demonstrate (1) that he or she is fit to be a custodial parent, (2) that material changes that affect the child's welfare have occurred since the original award of custody, and (3) that the positive good brought about by a change in custody will more than offset the disruptive effect of uprooting the child. Ex parteMcLendon, 455 So.2d at 865-66. Further, appellate review of custody determinations is quite limited, and a trial court's custody judgment is presumed correct and should be reversed only if the judgment is plainly and palpably wrong. Bates v.Bates, 678 So.2d 1160, 1161-62 (Ala.Civ.App. 1996).
On appeal the mother argues that the father failed to meet theEx parte McLendon standard and that the trial court improperly changed custody based on the visitation disputes between the parties. The mother is correct in asserting that visitation disputes, alone, are not a sufficient basis upon which to modify an existing custody judgment. See Kelley v.Akers, 793 So.2d 821, 826-27 (Ala.Civ.App. 2001); Vickv. Vick, 688 So.2d 852, 856 (Ala.Civ.App. 1997); Meansv. Means, 512 So.2d 1386, 1389 (Ala.Civ.App. 1987); andPons v. Phillips, 406 So.2d 932, 935
(Ala.Civ.App. 1981). We agree that the father did not meet his burden under Ex parte McLendon.
The father was required to show, among other things, that material changes that affect the child's welfare had occurred since the original award of custody. Ex parte McLendon,455 So.2d at 865. The father failed to present any evidence demonstrating a material change in circumstances affecting the child's welfare since the entry of the original custody award. Although there was evidence demonstrating the child's poor grades in the fourth and fifth grades, the testimony and other evidence indicated that the child had consistently performed poorly in school for at least the past two years. No time frame for the child's poor performance was established. The father never addressed how the child's continued poor academic performance demonstrated a material change in circumstances. Although there was evidence indicating that the child suffers from allergies, that evidence revealed that the child has suffered from allergies since the divorce and that he is treated for those allergies. Likewise, this evidence does not demonstrate a material change of circumstances.
Moreover, the father also failed to adduce any evidence to show that the positive good brought about by a change in custody would more than offset the disruptive effect of uprooting the child. The father admitted that, although he was worried about the child's grades, he had not offered a tutorial program to the child. In fact, the record is silent as to where the child would attend school if he were placed in the father's custody and as to the father's plans to assist the child with his poor academic performance. There was evidence indicating that the father's insurance coverage for the child has not been used. However, it was undisputed that the child has medical-insurance coverage and regularly receives medical care.
The mother testified that the child and the mother's other children love one another. The father admitted that, before his remarriage, when the child came for visitation, *Page 302 
the child's older half brother would also visit. It was undisputed that, after he remarried, the father informed the mother that the child's half brother could no longer visit when the child visited.
Although there was disputed, conflicting testimony, the question presented on appeal is one of law and the ore tenus
rule has no application. Ex parte Perkins,646 So.2d at 47. This court reviews questions of law de novo. AlabamaState Bar v. Caffey, 938 So.2d at 945. The father failed to adduce sufficient evidence to satisfy his burden under Exparte McLendon. The father's testimony primarily addressed the parties' visitation disputes. The father did not establish that material changes affecting the child's welfare had occurred since the original award of custody. Also, the father failed to show that the positive good brought about by a change in custody would more than offset the disruptive effect of uprooting the child.
We also note that several of the trial court's findings in its December 14, 2006, judgment are clearly erroneous and unsupported by the evidence and, therefore, do not support a modification of custody. In that judgment, the trial court found: "Testimony was undisputed that in the last 18 months the [father] has seen the minor child on one occasion." It is beyond question that this issue was, in fact, disputed. The following exchange occurred between the mother and her counsel:
 "Q. Okay. And, now, what they're complaining of within the last year and a half from June that he was a — I guess in his paperwork here that he had only seen the child one time within a year and a half; is that correct?
 "A. No, that's not correct."
Another exchange was as follows:
 "Q. Okay. Now, okay. So basically what you're saying here, then, that you never refused him to see his children — his child?
 "A. No, I didn't and I would never."
The father admitted that he had seen the child more than once in the last year.
In its December 14, 2006, judgment, the trial court also found:
 "The [father] testified that prior to the denial of visitation the minor child had consistently completed his homework while in the [father's] care and was not failing academically. There is little doubt that the [mother] does not supervise the child for purposes insuring that homework is done. There has been no effort made to enlist the services of tutors or obtain educational assistance for the child so as to bring him up to grade level. The child cannot academically achieve without a solid foundation upon which to build."
This court has been unable to find any testimony of record from the father indicating that the child "was not failing academically" before the alleged "denial of visitation." The only testimony regarding the child's completion of work and academic performance while in the father's care was the following testimony of the father:
 "What we do, when I would get [the child], we would put the same work in front of him and he would do it, like nothing. So [the child], basically he does it because he knows that his mother is not going to do nothing to him."
The trial court also found that there had been no effort made to "enlist the services of tutors or to obtain educational assistance for the child so as to bring" the child up to grade level. The only testimony of record regarding tutors or educational assistance was the father's admission that he *Page 303 
had not offered the child any tutorial program. The record is silent as to whether the mother had offered the child any tutors or educational assistance.
The trial court found that it "was undisputed that since the April 2002 divorce, the [mother] has lived in no less than six residences." The mother testified that she had lived at only three addresses since the April 2002 divorce. There wasdisputed testimony regarding the mother's addresses and residences.
When a trial court's judgment in a non-jury case is based onore terms testimony, the court's findings are presumed to be correct, and the judgment will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. BSIRentals, Inc. v. Wendt, 893 So.2d 1184, 1186
(Ala.Civ.App. 2004). The findings quoted above are clearly erroneous and without supporting evidence.
The trial court's judgment is due to be reversed insofar as it modifies custody because the father failed to adduce sufficient evidence to meet the Ex parte McLendon standard and because the trial court's judgment is clearly erroneous, without supporting evidence, and manifestly unjust. Therefore, we reverse the trial court's judgment modifying custody and remand the cause to the trial court for proceedings consistent with this opinion.
 B. Attorney's Fees and Costs
The trial court found that the mother had breached the separation agreement, and, pursuant to that agreement, the court awarded the husband $ 1,752 as attorney's fees and costs. The mother argues that the trial court exceeded its discretion in awarding the father attorney's fees and costs. However, the mother does not cite any authority in support of her argument that the trial court exceeded its discretion in making this award. When an appellant fails to cite any authority, we may affirm, for it is neither our duty nor our function to perform legal research for an appellant. McCutchen Co. v. Media Gen,Inc., 988 So.2d 998 (Ala. 2008); Gibson v. Nix,460 So.2d 1346, 1347 (Ala.Civ.App. 1984).
Regardless, the parties' separation agreement, which is expressly incorporated into the judgment of divorce, specifically provides:
 "Either party who violates this Agreement shall upon judicial finding of such violation be responsible for payment of all costs, expenses, attorney fees, and incidental and consequential damages made necessary by such violation."
In Alabama, attorney's fees are to be awarded only if provided for by statute, by contract, or by special equity. Bailey v.Sawyer, 991 So.2d 725 (Ala.Civ.App. 2007); Earl v.Jackson, 607 So.2d 161 (Ala. 1992). There was ample evidence of record to support the trial court's finding that the mother had violated the parties' separation agreement. The trial court did not err, i.e., it did not exceed the limits of its discretion, in awarding to the father $ 1,752 in attorney's fees and costs. Therefore, we affirm this part of the trial court's judgment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and BRYAN, J., concur.
PITTMAN, J., concurs in the result, without writing.
MOORE, J., concurs in part and concurs in the result, with writing.