BRYAN, Judge.
 

 The Montgomery County Department of Human Resources (“DHR”) appeals from a judgment of the Montgomery Juvenile Court refusing to terminate the parental rights of C.R. (“the mother”) to her children, S.R., a girl born on October 30, 2003, and W.J.R., a boy born on April 6, 2006 (hereinafter collectively referred to as “the children”). We reverse and remand with instructions.
 

 The record on appeal establishes the following. On January 5, 2004, B.R. (“the maternal grandmother”) and J.B. (“the maternal grandfather”) (hereinafter collectively referred to as “the maternal grandparents”) petitioned the juvenile court for custody of S.R.
 
 [1]
 
 The maternal grandparents’ petition alleged that S.R. had become dependent because “[t]he father is unknown and the mother is in a mental facility.” In March 2004, DHR filed with the juvenile court a report indicating, among other things, that, in May 2000, the Dallas County Department of Human Resources had awarded temporary custody of the mother’s two older children to J.J., the father of one of those children, “because of [the mother’s] history of mental illness and her inability to provide care for her children.” DHR’s March 2004 report also indicated that the mother had given birth to S.R. “while she was a patient at Bryce Hospital.” Upon her birth in October 2003, S.R. had been released into the care of the mother’s sister, K.E. The maternal grandparents filed their custody petition in January 2004 because K.E. had been hav
 
 *1164
 
 ing complications with her pregnancy and could no longer care for S.R.
 

 On March 3, 2004, the juvenile court entered an order awarding custody of S.R. to the maternal grandmother. On November 8, 2006, DHR petitioned the juvenile court for custody of S.R. DHR’s custody petition indicated that, in November 2004, the maternal grandmother had “requested emergency financial assistance from [DHR]” and that the maternal grandmother did not have a stable residence. DHR’s custody petition also indicated that, in September 2006, S.R. had been taken into the care of DHR pursuant to a “boarding home agreement” because “[the maternal grandmother] was not able to provide adequate shelter for [S.R.] at that time, as she was moving from motel to motel.” DHR’s custody petition further indicated that DHR had provided the maternal grandmother with financial and housing assistance but that the maternal grandmother had “used her money unwisely and was not able to maintain the housing.”
 

 DHR’s custody petition indicated that the mother had given birth to W.J.R. “on a sidewalk near Jackson Hospital” and that she had “abandoned [W.J.R.] at the hospital.” DHR’s custody petition also indicated that W.J.R. “had tested positive for crack-cocaine and syphilis at birth” and that the mother “had tried to ‘sell’ [W.J.R.] to [DHR] staff.” DHR’s petition further indicated that the juvenile court had granted custody of W.J.R. to DHR in April 2006.
 

 After a hearing on the matter, the juvenile court, on March 8, 2007, entered an order finding S.R. to be dependent and awarding temporary custody of S.R. to DHR. The juvenile court’s order also consolidated S.R.’s case with that of her younger brother, W.J.R. On May 8, 2007, DHR filed a petition to terminate the parental rights of the mother and of the unknown fathers to the children. DHR’s petition asserted that the mother had had no contact with W.J.R. since abandoning him at the hospital immediately after his birth and that she had had little contact with S.R. since her birth. DHR’s petition also asserted that, in November 2006, the mother had refused DHR’s offer of visitation with the children. DHR’s petition further asserted that the maternal grandmother had been “struggling with financial and medical problems and [had] recently beg[u]n seeking treatment for her mental illness, Schizoaffective Disorder.”
 

 DHR’s petition indicated that it had made extensive efforts to locate a relative with whom the children could be placed but that those efforts had been unsuccessful. Specifically, DHR’s termination petition asserted that
 

 “[DHR] has also been extensively searching for relatives for [S.R.], but we have not been successful. [The maternal grandmother] informed the [DHR] Worker that she was the only family member who cared about the children. However, the Worker was able to obtain some information and made the following contacts. On 10/24/06 [C.B.], [the mother’s] paternal grandmother, was contacted. Her daughter stated that [C.B.] is ill and unable to care for herself. On the same day [J.R.], [the mother’s] maternal uncle, was contacted. He stated that he could not care for children because of his work schedule and because he is coping with his wife’s death in July 2006. Also on 10/24/06 [M.L.R.], [the mother’s] maternal aunt, was contacted. She stated that she is very ill, is going into surgery, and then will be moving to Cleveland, OH. [K.S.], [the mother’s] maternal cousin, was contacted on 10/31/06. She stated that she has two small children of her own and has a small apartment with no extra space.
 
 *1165
 
 [Wi.R.], [the mother’s] maternal uncle, was also contacted on 10/31/06. He stated that he has five children of his own to care for and cannot assume any more responsibility.”
 

 DHR’s petition also indicated that all reunification services had been offered to the maternal grandmother rather than the mother (1) because DHR had been unable to locate the mother when W.J.R. entered its custody in April 2006 and (2) because the maternal grandmother had been S.R.’s legal custodian when S.R. entered the care of DHR in September 2006. With regard to its reunification efforts, DHR’s petition asserted that
 

 “[s]ince November 2004 [DHR] has been providing intermittent financial assistance to [the maternal grandmother] so that she could maintain housing, but this has not been successful. In February 2007 [the maternal grandmother] refused to visit with [S.R.] and [W.J.R.] until she could obtain legal counsel. Since that time, she has called once to check on their welfare. It should be noted that this call was in response to an Agency letter, in which she was invited to an [individualized service plan] meeting.”
 

 On June 6, 2007, the maternal grandmother petitioned the juvenile court for custody of the children. On June 25, 2007, the juvenile court held a permanency hearing and received into evidence a DHR report dated June 14, 2007. DHR’s June 2007 report indicated that the mother had been incarcerated at the Montgomery County Detention Facility in September 2006 on the charge of possession of a controlled substance. DHR’s June 2007 report also indicated that the mother had been released from jail for a short period but had been arrested again on December 7, 2006, for violating her probation. The report further stated that the maternal grandmother had suffered from “a long history of emotional instability” and that she had “a history of being able to follow her medication and therapy regime for a short period of time and then she stops taking her medication and becomes emotionally unstable, which affects her ability to adequately maintain a stable living environment.”
 

 On November 30, 2007, DHR filed with the juvenile court a report detailing its attempts to perform a home evaluation of the maternal grandmother’s residence. DHR had been unable to schedule a home evaluation of the maternal grandmother’s residence and stated in its report that
 

 “[the maternal grandmother] appears to struggle with finances and mental health issues. These are not new issues. [The maternal grandmother] currently has no stable residence and is not keeping her appointments with Montgomery Area Mental Health Authority. She has not visited with her grandchildren since June 2007. [DHR] has been unable to evaluate [the maternal grandmother’s] current situation, as she has lost her apartment and her cell phone very rarely has minutes on it in order for [DHR] to contact her.”
 

 On December 3, 2007, the juvenile court held a hearing on both DHR’s petition to terminate the mother’s parental rights and the maternal grandmother’s petition for custody. On January 7, 2008, the juvenile court entered a judgment granting the maternal grandmother’s custody petition and
 

 “specifically finding] that [DHR] failed to provide sufficient evidence to support their request for termination. The Court further finds that [DHR] failed to provide sufficient evidence that no viable relative resources exist. The testimony presented at trial leads the Court to believe that [the maternal grandmother] has the present ability to act as custodi
 
 *1166
 
 an for the minor children and has changed her circumstances to such a degree that she is a viable relative resource for placement of the minor children. The testimony presented at trial further indicates that, although [the maternal grandmother] has previously had other children removed from her custody by [DHR], [DHR] has previously given custody of [S.R.] to [the maternal grandmother] despite the previous allegations brought against her in Dallas County. The Court is further of the opinion that with the assistance of [DHR] ... [the maternal grandmother] has the ability to provide for the needs of the minor children.”
 

 On January 22, 2008, DHR moved the juvenile court to alter, amend, or vacate its January 7, 2008, judgment. DHR also moved the juvenile court to stay enforcement of its January 7, 2008, judgment pending an evaluation of the maternal grandmother’s residence.
 
 [2]
 
 After holding a hearing, the juvenile court, on February 6, 2008, entered an order purporting to deny DHR’s January 22, 2008, postjudgment motion.
 
 [3]
 
 DHR appeals.
 

 During the December 3, 2007, hearing, the juvenile court heard testimony from the maternal grandmother and from Sandra Northrop, the children’s DHR caseworker (“the caseworker”).
 
 [4]
 
 The maternal grandmother, who was 47 years old at the time of trial, had been renting a one-bedroom “public-housing” apartment for $89 per month and had been residing alone at that residence since November 13, 2007. The maternal grandmother testified that someone “at public housing” had informed her that she would qualify for a larger apartment if the juvenile court awarded her custody of the children.
 

 The maternal grandmother’s sole source of income was a monthly “SSI” payment in the amount of $623. The maternal grandmother was also eligible to receive food stamps, and she testified that she would receive an “additional allotment” of food stamps if the juvenile court awarded her custody of the children. The maternal grandmother testified that, if awarded custody of the children, she believed that she would have enough money to care for the children and that the children’s medical needs would be provided for by Medicaid; however, the maternal grandmother later testified that she still owed $800 to her previous landlord because of missed rent payments and that she had had problems managing her finances in the past.
 

 At the time of trial, the maternal grandmother suffered from high blood pressure and “different other illnesses,” and she had been taking medication for her high blood pressure. The maternal grandmother had been hospitalized in October 2006 because she had been experiencing chest pains that her doctor later diagnosed as having been caused by “smokfing] too many cigarettes.” The maternal grandmother testi
 
 *1167
 
 fied that she continued to smoke the same number of cigarettes as she had been smoking when she was hospitalized in October 2006. The maternal grandmother had also been diagnosed with schizophrenia, and she had been taking medication and receiving treatment at “Mental Health” for her schizophrenia. The maternal grandmother testified that she is capable of caring for the children when she is “on [her] medications” and that she had “always taken [her] medication faithfully.” The maternal grandmother also testified that the mother was not capable of caring for the children because “she’s on drugs and she has a mental problem.”
 

 All the maternal grandmother’s biological children had been removed from her custody beginning with her oldest son being removed in 1977 because of “neglect and [the maternal grandmother’s] emotional instability.” The maternal grandmother’s other three sons had been removed from her custody in 1990 because she “couldn’t do nothing with them” due to her “emotional problems” and “mental illness.”
 
 [5]
 
 Additionally, the maternal grandmother’s oldest daughter had been removed from her custody when she was 13 or 14 years old, and the mother had been removed as a baby; however, the maternal grandmother testified that all her children had been returned to her custody, although she could not recall in which year that occurred.
 
 [6]
 

 The maternal grandmother had' never resided in one residence for longer than one year. The maternal grandmother’s psychiatrist had informed her that her “problems staying in a house” were being caused by her schizophrenia. The maternal grandmother testified that she had resided in her residences for short periods of time because “the voices ... was telling me to up and move.” The maternal grandmother also testified that she only “hears the voices” when she has not been taking her medication. The caseworker later testified that the maternal grandmother has “a history of moving from place to place” and that the maternal grandmother has never had a stable home “for a long period of time.”
 

 The maternal grandmother could not recall the dates that she had last visited either S.R. or W.J.R. The maternal grandmother testified that she had not “follow[ed] up with the visitation” with S.R. because “[e]verytime I leave [S.R.], she’s crying, wanting to go with me and I can’t deal with that.” The maternal grandmother also testified that she “was supposed to go see [S.R.] for her birthday October 30th” but that she had “refused to go.”
 

 The maternal grandmother contacted DHR in September 2006 because she was no longer able to care for S.R. In September 2006, the maternal grandmother signed a “boarding home agreement” and placed S.R. with DHR because she had lost her residence and had been residing in a motel. During that time, DHR twice helped the maternal grandmother to make her motel payments, and DHR also later provided the maternal grandmother with a down payment on an apartment; however,
 
 *1168
 
 DHR removed S.R. from the maternal grandmother’s custody on the most recent occasion because, according to the maternal grandmother, she was residing “in a motel once again.”
 

 The maternal grandmother had been incarcerated previously for writing “worthless check[s].”
 
 [7]
 
 The maternal grandmother had been paying a fine in the amount of $50 per month on that charge; however, the maternal grandmother was not current on those payments at the time of trial.
 

 The maternal grandmother neither notified DHR of her address after moving into her current residence nor notified DHR after moving into her previous residence. The maternal grandmother had had virtually no contact with DHR since September 2006, and, despite the fact that her attorney had informed her that she “needed to follow up with [individualized service plan] meetings” to be awarded custody of the children, she could not remember the date of the last individualized service plan meeting that she had attended.
 

 The maternal grandmother had attempted suicide three times either by cutting her wrists or by taking “an overdose”; however, the maternal grandmother testified that she had not had any suicidal thoughts during the previous three to five years. The maternal grandmother also testified that she had not been hospitalized for mental-health problems in three or four years but that she still struggles with depression.
 

 The caseworker’s testimony established that the mother had shown little, if any, interest in being a part of the children’s lives. According to the caseworker, the mother had not seen W.J.R. since giving birth to him in April 2006 and the mother had not seen S.R. since September 2006. The caseworker testified that the mother had never had any telephone contact with the children, had paid no child support, and had filed no petition for custody of the children.
 

 The caseworker testified that the mother was, at the time of trial, hospitalized at a psychiatric facility named “Meadhaven.” The mother had previously been hospitalized for mental-health problems at “Bryce Psychiatric Hospital” in Tuscaloosa and at “Griel Hospital,” which is the location where S.R. was born.
 

 The caseworker testified that she had contacted the maternal grandmother in June, August, and October 2007 to set up a home evaluation of the maternal grandmother’s residence; however, the maternal grandmother had refused to set an appointment because she wanted to wait until she had moved into her public-housing apartment.
 
 [8]
 
 However, even after the maternal grandmother had relocated on November 13, 2007, she did not contact the caseworker to inform her that she had relocated or to schedule a home evaluation. The caseworker did not learn that the maternal grandmother had relocated until she finally reached the maternal grandmother by telephone on November 30, 2007. The caseworker testified that the maternal grandmother had not maintained “consistent contact with [DHR] with regard to her [housing] situation.”
 

 According to the caseworker, the children’s lives would be disrupted if they were removed from their foster mother’s care because “[W.J.R.] does not know [the maternal grandmother]” and “because of
 
 *1169
 
 the instability that [S.R.] had with [the maternal grandmother] prior to being placed in foster care.” DHR had contacted at least six other relatives with regard to providing care for the children, but each of those relatives had been unable or unwilling to care for the children. The caseworker was not aware of any other relatives with whom the children could be placed. The caseworker testified that the children had been doing “great” with their foster mother and that the foster mother had expressed her desire to adopt the children.
 

 The caseworker testified that DHR had been unable to offer any rehabilitative services to the mother because “[d]uring the pendency of this case, [the mother] has either been incarcerated or in a mental health facility....” DHR had offered rehabilitative services to the maternal grandmother, including the multiple attempts to schedule a home evaluation of the maternal grandmother’s residence and the numerous instances of financial assistance; however, the caseworker testified that the maternal grandmother had not modified her behavior or demonstrated to DHR that her circumstances had changed to the extent that she was able to care for the children. The caseworker also testified that it would be in the children’s best interests for the juvenile court to terminate the mother’s parental rights.
 

 This court affords no presumption of correctness to the juvenile court’s application of the law to the facts.
 
 See Brooks v. Brooks,
 
 991 So.2d 293, 300 (Ala.Civ.App.2008). Furthermore,
 

 “ ‘ “ ‘[t]he appellate courts do not sit in judgment of the facts, and [they] review the factfinder’s determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law.””
 
 Ex paHe T.V.,
 
 971 So.2d 1, 9 (Ala.2007) (quoting
 
 Hinds v. Hinds,
 
 887 So.2d 267, 272-73 n. 2 (Ala.Civ.App.2003), quoting in turn
 
 Curtis White Constr. Co. v. Butts & Billingsley Constr. Co.,
 
 473 So.2d 1040, 1041 (Ala.1985)).”
 

 J.W.M. v. Cleburne County Dep’t of Human Res.,
 
 980 So.2d 432, 433 (Ala.Civ.App.2007).
 

 The evidence establishes that the children were dependent, as defined in § 12-15-1(10), Ala.Code 1975. The juvenile court had made prior determinations in this case finding the children dependent. The mother’s inability to discharge her parental responsibilities was established through evidence of her ongoing mental illness, numerous hospitalizations at psychiatric institutions, chronic drug abuse, and complete lack of contact with the children. The maternal grandmother’s inability to discharge her responsibilities to the children was established through evidence indicating that she had been unable to maintain adequate housing due to her schizophrenia. Thus, after considering the evidence in the record, we conclude that the evidence supports a determination that the children are dependent.
 

 According to
 
 Ex parte Beasley,
 
 564 So.2d 950, 952 (Ala.1990), after finding that the children are dependent, a juvenile court should next determine whether a viable alternative exists to the termination of parental rights. In this case, the juvenile court determined that placing the children with the maternal grandmother was a viable alternative to terminating the mother’s parental rights; therefore, the juvenile court declined to terminate the mother’s parental rights. DHR argues on appeal that no viable alternative to the termination of the mother’s parental rights existed; thus, DHR argues, the juvenile court erred in failing to terminate the mother’s parental rights. We agree.
 

 
 *1170
 
 The juvenile court received undisputed evidence establishing (1) that all the maternal grandmother’s children had been removed from her custody and, more specifically, that three of her sons had been removed because she had been unable to control them due to her mental illness; (2) that the maternal grandmother, again due to her mental illness, had not been able to maintain any of her residences for more than one year and had had S.R. removed from her care by DHR because she had been relocating frequently and had been residing in motels; (3) that the maternal grandmother had attempted suicide on three separate occasions; (4) that the maternal grandmother had been convicted of writing worthless checks and, at the time of trial, was delinquent on her fine payments; and (5) that the maternal grandmother continued to suffer from both schizophrenia and depression. Although some of these incidents were somewhat remote in time, they still evidence the maternal grandmother’s inability to properly care for herself, her biological children, and, in this case, her grandchildren (the children). When viewing the totality of the evidence regarding the maternal grandmother’s unfitness, the juvenile court had more than ample evidence from which it should have concluded that awarding custody to the maternal grandmother would not be in the best interests of the children.
 

 DHR properly carried out its statutory duty to perform a study of relatives seeking custody of these dependent children.
 
 See
 
 Ala.Code 1975, § 12-15-71(a)(3)c. Based upon its study, DHR reasonably excluded the maternal grandmother as a potential placement for the children. DHR proved that the maternal grandmother was unsuited to obtain custody of the children; thus, the juvenile court erred, as a matter of law, in determining that the maternal grandmother was a viable alternative to the termination of the mother’s parental rights.
 
 Cf. T.B. v. Cullman County Dep’t of Human Res.,
 
 6 So.3d 1195, 1205 (Ala.Civ.App.2008) (affirming the juvenile court’s judgment denying the paternal grandmother’s petition for custody when the evidence established, among other things, that the paternal grandmother had been cited previously by the Cull-man County Department of Human Resources for neglecting her own children, that the paternal grandmother had visited with the children less often as the case progressed, and that the paternal grandmother had allowed the father, whose parental rights to the children had been terminated, to visit with the children).
 
 [9]
 

 The judgment of the juvenile court is reversed, and this cause is remanded to the juvenile court with instructions to enter a judgment consistent with this opinion.
 

 REVERSED AND REMANDED WITH INSTRUCTIONS.
 

 THOMPSON, P.J., and PITTMAN, J., concur.
 

 
 *1171
 
 THOMAS, J., concurs in the result, without writing.
 

 MOORE, J., dissents, without writing.
 

 [1]
 

 . The maternal grandparents maintained a relationship for 18 years but never married. The mother is the only child bom of their relationship. The maternal grandparents ended their relationship only a few days after they had petitioned the juvenile court for custody of S.R. The maternal grandfather is not a party to this appeal.
 

 [2]
 

 . The juvenile court granted DHR’s motion to stay on February 5, 2008.
 

 [3]
 

 . Under Rule 1(B), Ala. R. Juv. P., “[a] post-judgment motion is deemed denied if not ruled on within 14 days of filing.” In diis case, DHR's January 22, 2008, postjudgment motion was denied by operation of law on February 5, 2008; thus, the juvenile court's February 6, 2008, order purporting to deny DHR’s postjudgment motion was a nullity. However, there is no issue regarding the timeliness of DHR’s notice of appeal. DHR filed its notice of appeal on February 19, 2008, which was within 14 days of the denial of its postjudgment motion.
 
 See
 
 Rule 28(C), Ala. R. Juv. P. ("Written notice of appeal shall be filed within 14 days of the date of the entry of order or judgment appealed from, whether the appeal is to an appellate court or to the circuit court for trial de novo.”).
 

 [4]
 

 .The mother failed to appear at the December 3, 2007, proceeding.
 

 [5]
 

 . The maternal grandmother testified that, before her three sons were removed in 1990, she had become unable to control or discipline them because "they got real big and they started stealing and they wouldn't do right in school. And no matter what I did ... it just didn't do any good.... ”
 

 [6]
 

 . The caseworker later testified that the maternal grandmother had an "extensive history” with DHR, including “four [cases] for neglect and one [case] for abuse.” The caseworker also testified that all the maternal grandmother’s children had been removed from the maternal grandmother’s custody and that she was not aware of any of the maternal grandmother’s children being returned to her.
 

 [7]
 

 . The record indicates that, in December 2004, the maternal grandmother had been “charged with Writing Worthless Checks that totaled $1388.00.”
 

 [8]
 

 . The record indicates that the maternal grandmother was evicted from her prior residence.
 

 [9]
 

 . As mentioned earlier, DHR had made at least three separate requests to conduct a home study of the maternal grandmother's residence but had been denied on each occasion.
 
 See
 
 § 12 — 15—71(a)(3) c, Ala.Code 1975 (providing that, after a child is found to be dependent, the juvenile court may transfer legal custody to a relative who,
 
 "after study by the Department of Human Resources,
 
 is found by the court to be qualified to receive and care for the child.” (emphasis added));
 
 Barnett v. Winstead,
 
 555 So.2d 1131, 1132 (Ala.Civ.App.1989) (reversing the trial court's judgment that, after finding the child to be dependent, awarded temporary custody of the child to the maternal aunt and uncle without the applicable department of human resources having conducted a study as required by § 12-15-71 (a)(3)).