MOORE, Judge.
K.E.W. (“the father”) appeals from a judgment of the Chilton Circuit Court (“the trial court”) denying his petition for a change of custody of the child born of his marriage to T.W.E. (“the mother”). We reverse the trial court’s judgment.

Procedural History

On January 2, 1997, the trial court entered a judgment divorcing the mother and the father, awarding custody of the parties’ child to the mother, and awarding the father visitation. On January 6, 1999, the trial court modified the divorce judgment to expand the father’s visitation rights to every other weekend. On February 17, 2006, the father filed a petition requesting custody of the child, alleging, among other things, that the mother had concealed that D.M.E., the man she had married three years earlier and who currently resided with her and the child, was a registered child sex offender.
On March 9, 2006, after conducting a hearing on a motion for an emergency change of custody filed by the father, the trial court entered an order awarding the father pendente lite custody of the child and awarding the mother visitation, provided the mother’s husband would not be present during the visitation.
The trial court conducted a final hearing on August 10 and August 29, 2006. On September 6, 2006, the trial court entered a judgment denying the father’s petition for custody. On October 5, 2006, the father filed a motion to alter, amend, or vacate the September 6, 2006, judgment. The trial court denied the father’s motion on October 23, 2006. The father filed his notice of appeal on November 28, 2006.

*377
Facts

The parties’ child, a daughter, was born on May 17, 1996. After the parties divorced in 1997, the child has resided with the mother in trailer parks in Jemison and Clanton. According to the parties, the child is naturally withdrawn and quiet. The child is affectionate with her mother, but she has not developed a strong or affectionate bond with her father or any other adult. A church member who drove the child to church in a church van testified that the child seemed well-behaved.
The father married another woman in May 1997. They had a daughter together, who at the time of trial was nine years old. The father lives 10 miles from the mother, in Shelby County. The father has been steadily employed since he married his current wife. He has continuously paid child support and has exercised his visitation with the child. All parties agree that the father is a good father.
In the latter part of 2000, the mother met D.M.E. at the restaurant where she was working. The two started dating two or three weeks later. According to the mother’s testimony, D.M.E. informed her early in their relationship of charges that had been filed against him for allegedly committing sex crimes. D.M.E. testified that he had been charged with three different sexual crimes against children, all involving improper touching. He had not been convicted of the first two charges, but another charge was still pending. Because of those charges, at first, the mother would not let D.M.E. stay overnight with her and the child. However, after she had been dating D.M.E. for four months, she felt her daughter would be safe around him. The mother talked to a “bunch of people,” but not the alleged victims, and she became convinced that D.M.E. had been falsely accused of the sex crimes. The mother further testified that “my Lord told me” the child would be safe around D.M.E.
In 2001, after the mother had concluded that D.M.E. had not committed any sex crimes, the mother and the child moved in with D.M.E. D.M.E. testified that, after the mother and child moved in, his lawyer advised him to enter a guilty plea in the pending criminal case. According to D.M.E., his criminal attorney told D.M.E. that he would be convicted and receive a 30-year sentence if he did not plead guilty but that, if he pleaded guilty, he would spend only 1 night in jail and be placed on probation. D.M.E. talked it over with the mother and several other people before deciding to follow his lawyer’s advice. He pleaded guilty to improper touching of a child and, thereafter, registered as a sex offender. Nevertheless, D.M.E. maintained in pretrial psychological counseling sessions and at the trial in this case that he had not committed any sexual act against a child and that he had made a mistake by pleading guilty to the offense.
According to the mother’s testimony, she informed the father on March 24, 2002, at a gasoline service station in Jemison of D.M.E.’s criminal history. The mother testified that the father had simply shrugged his shoulders and walked away. The father denies this conversation took place.
After living with D.M.E. for two or three weeks, and after D.M.E. had pleaded guilty, the mother and D.M.E. married. At first, D.M.E. resided in the home with the mother and the child. However, D.M.E. testified that his probation officer informed him that he could no longer reside with a minor. Thereafter, D.M.E. moved out of the residence. He lived in his truck for a time before moving into a travel trailer. A report entered as an exhibit in the case indicated that D.M.E. had told his psychologist that in June 2005 *378 “the law changed” and that he had moved back in with the mother and the child. At trial, the mother testified that she had explained these unusual living arrangements to the child by telling the child that D.M.E. had been wrongfully convicted of a sex crime that he did not commit.
At the time of trial, D.M.E. was working 10 to 14 hours per day. D.M.E. testified that after work he would return to the home where the mother and the child resided with D.M.E.’s child from a previous marriage. D.M.E. would stay with them until they went to sleep, at which time he would go sleep in a travel trailer.[1] D.M.E. would then get up early in the morning and leave for work. The mother’s stepfather testified that he had observed D.M.E. and the family’s routine and that he found D.M.E. to be a good man with a good relationship with the child.
D.M.E. testified that although he was at the child’s home at all times except when he was working or sleeping, he never spent any time alone with the child. D.M.E. said the two had developed a good relationship, although not an affectionate one. According to D.M.E., when the child was younger, he would raise his voice, curse her, and discipline her with spankings with a belt, especially when she would lie or talk back. However, he had not used such discipline for some time prior to the trial. D.M.E. denied at trial that he had done anything adverse to the child that would constitute molestation or abuse. He testified that he had taught the child how to cultivate plants. They also went to movies and went camping together with the mother at Dauphin Island or Biloxi, Mississippi. D.M.E. further testified that he attends church twice a week and that he has stopped drinking and cursing. A church member testified that D.M.E. appeared to be a good man who could be trusted around children. It is undisputed that D.M.E. is the sole financial provider for the mother.
The father testified that on February 13, 2006, he discovered D.M.E. was a registered sex offender. He sought legal representation within three or four days after discovering that fact. He filed his petition for a change of custody on February 17, 2006. The father testified that he was concerned for the child’s safety. He understood that D.M.E. had pleaded guilty to a sex crime, and he believed that D.M.E. would not have entered such a plea unless he had committed the crime. The father also expressed concern over bruises he and his wife had observed on the child and concern that the child was being subjected to verbal abuse by D.M.E. and the mother.
The trial court awarded the father pen-dente lite custody on March 9, 2006. Before custody was transferred from the mother to the father in March 2006, the mother testified that the child was a good student; however, the child had recently made a “D” in one class. After the custody transfer, the parties agreed that the child’s grades had generally improved and that she had made the A/B honor roll for the first time. The father testified that the child also expressed a new interest in extracurricular activities such as baton and cheerleading. The father also testified that the child had participated in family outings with the father, her stepmother, and her half-sister; the family had conducted cookouts and had gone bowling, swimming, and to the movies during those outings. According to the father, the child seemed to open up to him and his family much more than she had previously. The father testified that he felt that the child had suffered from low self-esteem before the change of custody but that her self- *379 esteem was improving under his care. He admitted, however, that his relationship with the child was still not as good as the relationship he shared with his other daughter.
According to the mother, the child enjoyed her relationship with her stepmother and her half-sister, but complained that the father was away fishing a lot. ■ The mother admitted that the child had made no indication that anything harmful or inappropriate had occurred while she was in the custody of her father, but the mother testified that the child consistently expressed a desire to return to the mother’s home.
In March 2006, D.M.E. underwent a psychological evaluation. According to a report admitted into evidence, the psychologist determined that “there was no evidence obtained during this evaluation to suggest that [D.M.E.] poses a risk to any children around him. An assessment of the children and other adults involved would provide more information however.” Pursuant to the trial court’s orders, the father, the mother, and the child also attended six weeks of counseling sessions. On August 8, 2006, a licensed professional counselor issued a report, which the trial court admitted as an exhibit based on a stipulation of the parties, indicating that he found no evidence that the child’s behavior had been affected by her living arrangement with D.M.E. or that the child perceived D.M.E. as a threat. According to the counselor’s report, the child characterized D.M.E. as “fun and nice.” The child indicated to the counselor that she wanted to return to live with her mother and that she had a stronger bond with D.M.E. than her father, although she loved her father. The counselor recommended that, “all things being equal,” the mother should retain custody of the child and that removal of the child from the mother’s custody would negatively impact the child.
Following the final hearing, the trial court decided to return the child to the primary physical custody of the mother. The trial court explained his reasoning at length to the parties. The trial court considered the sole issue in the case to be “whether the fact that the former wife has married, or remarried, a person who has been convicted of a sex offense, and therefore is a registered sex offender, is sufficient to meet the requirements of the law in [Ex parte] McLendon, [455 So.2d 863 (Ala.1984),] and whether that fact justifies a change in custody.” The trial court stated that it found that no abuse of the child had occurred. Ultimately, the trial court concluded that the father had failed to carry his burden of proof, and it denied the father’s petition for a change of custody.

Discussion

Because the mother had custody of the child at the time the father filed his petition to modify, the standard set forth by our Supreme Court in Ex parte McLendon, 455 So.2d 863 (Ala.1984), is applicable to this case.
“In Ex parte McLendon, supra, our supreme court held that the proper standard to be applied in child-custody cases wherein a parent has either voluntarily forfeited custody or has lost custody due to a prior judgment is whether there has been a material change in circumstances since the prior judgment; whether a change in custody will materially promote the best interests of the child; and whether the benefits of the change in custody will more than offset the inherently disruptive effect caused by uprooting the child.”
Barber v. Moore, 897 So.2d 1150, 1153 (Ala.Civ.App.2004).
*380 A material change of circumstances occurs when important facts unknown at the time of the initial custody judgment arise that impact the welfare of the child. Mock v. Mock, 673 N.W.2d 635, 638 (N.D.2004). A custodial parent’s change of environment that endangers the child’s physical or emotional health, safety, or well-being constitutes a material change of circumstances. Id. Undoubtedly, a custodial parent’s actions that expose a child to a registered sex offender is a material change of circumstances affecting the physical and emotional health, safety, and well-being of the child. Id.
The next question is “whether a change in custody will materially promote the best interests of the child.” Barber, 897 So.2d at 1153. In D.N. v. J.H., 782 So.2d 323 (Ala.Civ.App.2000), this court considered a similar situation. The father in D.N. discovered that the mother, who had been awarded custody of their six-year-old child in a previous judgment, had become engaged to a man who had been convicted of first-degree sexual abuse and first-degree sodomy for engaging in “deviant sexual intercourse” with a nine-year-old female. 782 So.2d at 324. The mother in D.N. knew of her fiancé’s crimes, but she originally considered him to be a “changed person” who could be trusted around her children. 782 So.2d at 325. She lived with the convicted sex offender for five months, even allowing him to be alone with the child at issue and her other children outside her presence, a decision she later admitted was wrong. The mother in D.N. ended her relationship with the sex offender after the father filed a petition for change of custody. The trial court denied the petition for change of custody on the sole condition that the mother not reestablish her relationship with the sex offender. On appeal, this court reversed the trial court’s judgment. The court noted that the mother had ended the relationship with the sex offender, but it held that her past behavior of allowing her child to be exposed to a man convicted of committing deviant sexual acts with a nine-year-old child showed “an inclination that increases the likelihood that she will place the minor child in a dangerous or abusive situation.” 782 So.2d at 326. The court therefore held that the trial court had exceeded its discretion in denying the petition for a change of custody, a decision that this court considered “plainly and palpably wrong.” Id.
Many of the facts of this case mirror those in D.N. D.M.E. has been convicted of a sexual crime against children. The mother is convinced that D.M.E. did not commit any offense and that he is a good man who may be trusted around her 10-year-old daughter. Before the petition for a change of custody was filed, the mother had been involved in a living arrangement with D.M.E. for four years during which D.M.E. had daily contact with the child, although D.M.E. tried to avoid ever being left alone with her. Even worse than in D.N., the mother in this case has not ended her relationship with D.M.E. and continues to expose the child to a convicted sex offender.
The facts of this case differ from D.N. in only one material aspect. The record contains significant evidence indicating that D.M.E. is not a threat to the child. Besides the uncontradicted testimony that D.M.E. never spends any time alone with the child, the testimony of D.M.E., the mother, and the mother’s stepfather established that D.M.E. has a normal stepfather relationship with the child. The psychologist indicated that D.M.E.’s presence did not endanger the child. The licensed professional counselor also indicated that the child considered her relationship with D.M.E. to be good and nonthreatening. *381 Finally, D.M.E. denied committing the offense for which he had pleaded guilty.
The trial court evidently determined that whether being in a living arrangement with a convicted sex offender represents a threat to the best interests of a child is a question of fact. The trial court considered the foregoing evidence pertaining to that inquiry and basically concluded that D.M.E. did not pose a threat of harm to the child. The trial court further concluded that the child was content and that her interests were being served while in the mother’s custody. Thus, as the counselor put it in his report, “all things being equal,” the child should remain with the mother since the McLendon standard requires the father to prove that the best interests of the child would be materially promoted by a change of custody.
The trial court erred in this reasoning. Our legislature has conclusively established as a matter of law that it is in the best interests of the children of this state to avoid any living arrangement with a person convicted of a sex offense committed against children. Section 15-20-26(c)(4), Ala.Code 1975, provides:
“(c) No adult criminal sex offender shall establish a residence or any other living accommodation where a minor resides. Notwithstanding the foregoing, an adult criminal sex offender may reside with a minor if the adult criminal sex offender is the parent, grandparent, or stepparent of the minor, unless one of the following conditions applies:
[[Image here]]
“(4) The adult criminal sex offender has ever been convicted of any criminal sex offense involving a child, regardless of whether the offender was related to or shared a residence with the child victim.”
The legislature has explicitly declared that the purpose behind the residency requirements of § 15-20-26 is “to protect the public, especially children, from convicted criminal sex offenders” who, the legislature has found, pose a danger of recidivism. Ala.Code 1975, § 15-20-20.1. This court recently affirmed that § 15-20-26 is a civil remedial statute designed “to protect communities and their most vulnerable citizens, children, from the proven danger of recidivism by criminal sex offenders.” Salter v. State, 971 So.2d 31 (Ala.Civ.App.2007) (citing Lee v. State, 895 So.2d 1038, 1042 (Ala.Crim.App.2004)) (emphasis added).
Unlike other state legislatures, the Alabama Legislature has not granted trial courts the power to award custody to a parent who resides with or otherwise engages in a living accommodation with a convicted sex offender. See, e.g., Cal. Fam.Code § 3030(a)(2) (West 2007) (allowing trial court to award custody to parent who resides with convicted sex offender if trial court finds, in writing, that there is no significant risk of harm to the child). Rather, the legislature has created a rule without exception for the protection of the children of this state. It would violate Alabama’s stated public policy to award custody of a minor to a parent who resides with or shares a living accommodation with a registered criminal sex offender convicted of crimes against children, regardless of the opinion of experts, lay persons, and the trial court that the registered sex offender does not pose a threat to the child.
In this case, D.M.E. resided with the mother and the child except when he was sleeping and working. During the night, D.M.E. would stay in a travel trailer, the location of which was not divulged at the hearing in this matter. In Sellers v. State, 935 So.2d 1207 (Ala.Crim.App.2005), the Court of Criminal Appeals considered a *382 constitutional challenge to § 15-20-26 asserting that the statute was void for vagueness. The Sellers court noted that the void-for-vagueness doctrine “ ““ “requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.”””” 935 So.2d at 1211 (quoting Vaughn v. State, 880 So.2d 1178, 1195 (Ala.Crim.App.2003), quoting in turn Timmons v. City of Montgomery, 641 So.2d 1263, 1264 (Ala.Crim.App.1993), quoting in turn McCorkle v. State, 446 So.2d 684, 685 (Ala.Crim.App.1983), quoting in turn Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). Relying on an opinion from the Attorney General that characterized the statute as a penal statute, the Court of Criminal Appeals defined “living accommodation” as “any overnight lodging, either temporary or permanent.” 935 So.2d at 1213.
We do not read Sellers as necessarily limiting the definition of “living accommodation” solely to arrangements in which the offender lodges overnight in the minor’s residence. Rather, because § 15-20-26 is a civil remedial statute, its terms should be liberally construed to effect its purpose and to advance the remedy for which it was enacted. Austin v. Alabama Check Cashers Ass’n, 936 So.2d 1014, 1026 (Ala.2005). Based on the purpose of the statute to protect children from the danger of recidivism posed by criminal sex offenders, we conclude that the term “living accommodation” certainly includes an arrangement whereby the criminal sex offender, who is married to the child’s mother, financially provides for the child and the child’s mother; eats all of his meals at the child’s home; cultivates a garden at the home with the child; and is present in the child’s home during all of his waking hours except when working. These activities generally allow the criminal sex offender protracted time with the child in a private setting and expose the child to the risk of recidivism the statute was designed to prevent. Even in this case, in which the criminal sex offender makes every effort never to be alone with the child, the risk of recidivism remains because of the living arrangement adopted by the mother.
Based on the foregoing analysis, the trial court should have concluded as a matter of law that it was not in the best interests of the child to remain in a living arrangement with the mother and a registered criminal sex offender and that the child’s best interests would be materially promoted by a change of custody to the father. The trial court should not have denied the petition on the ground that the father had failed to prove that D.M.E. was an actual threat to the child.
To summarize, we hold that the marriage of a custodial parent to a registered criminal sex offender constitutes a material change of circumstances; that, as a matter of law, it is not in the best interests of the child to share a living arrangement with a stepparent who is a registered criminal sex offender; and that the trial court erred in denying the father’s petition for a change of custody. We therefore reverse the trial court’s judgment and remand this cause to the trial court for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and BRYAN and THOMAS, JJ., concur.
PITTMAN, J., concurs in the result, without writing.

. The record is silent as to the location of this travel trailer.