Rel: August 22, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

_____

## CL-2024-0897

_____

## Daniel Colby Courson

### v.

## Heather C. Hurston

### Appeal from Russell Circuit Court
### (DR-17-900165.02)

EDWARDS, Judge.

Daniel Colby Courson ("the father") appeals from an August 26, 2024, judgment entered by the Russell Circuit Court ("the trial court"). That judgment modified a previous custody-modification judgment entered by the trial court on May 24, 2023 ("the May 2023 custody-

modification judgment") by awarding Heather C. Hurston ("the mother") sole physical custody of the parties' two sons, B.C. ("the older son") and C.C. ("the younger son"); the older son and the younger son are sometimes referred to collectively as "the children." The record reveals the following pertinent procedural history.

Pursuant to the May 2023 custody-modification judgment, the father and the mother had been awarded joint legal custody of the children, and the father had been awarded sole physical custody of the children, subject to the mother's right to specified visitation. On June 13, 2023, the mother filed a postjudgment motion to alter, amend, or vacate the May 2023 custody-modification judgment or, in the alternative, for a new trial. Despite conducting a hearing, the trial court did not enter an order on the mother's postjudgment motion, and the mother's postjudgment motion was denied by operation of law on September 11, 2023. See Rule 59.1, Ala. R. Civ. P.

On September 20, 2023, not quite four months after the trial court entered the May 2023 custody-modification judgment and just over a week after her postjudgment motion was denied by operation of law, the mother filed a petition seeking to modify the custody of the children.

2

Invoking Ex parte McLendon, 455 So. 2d 863 (Ala. 1984), the mother asserted in her petition that there had been a material change in circumstances since the entry of the May 2023 custody-modification judgment. The mother alleged that the father had alienated the children from her; that, as she had argued in the custody-modification trial held in April 2023, Carol Childs ("the paternal grandmother") was the children's actual primary caregiver; and that Childs would not communicate with her regarding the children. The trial court conducted a two-day trial on July 24, 2024, and August 9, 2024, and heard testimony from the mother and the father. The following information was revealed at trial.

The mother testified that she lived in Cedartown, Georgia, and that she had remarried in 2021, before the entry of the May 2023 custody-modification judgment. She testified that she was employed at the time of the 2024 modification trial as a medical receptionist and that she worked 10-hour shifts 4 days each week.[1] The father, who is a landscaper, indicated that he still maintained the same employment and work schedule that he had had in May 2023. The father testified that he

_____

[1]The mother indicated that she worked Tuesday through Friday.

typically left for work at 6:47 a.m. and returned home by 4:30 p.m. He testified that he still resided in the same residence in Phenix City in which he had been residing at the time of the entry of the May 2023 custody-modification judgment and that he resided there with the children; the paternal grandmother; the paternal grandmother's husband, Brian Childs ("the paternal stepgrandfather"); and the father's cousin, Abbey Gualtney ("the paternal cousin"). He testified that the paternal grandmother was responsible for taking the children to school in the mornings and picking them up in the afternoons.

The mother's testimony largely focused on her general displeasure with the father's coparenting after the conclusion of the April 2023 custody-modification trial. She testified that she believed that the father had not adequately communicated with her regarding the children and had not always responded to her numerous and repetitive inquiries regarding the children; the father acknowledged that he had not always responded to the mother's messages. The record indicates that the parties' coparenting issues had been a focus of the previous custody-modification action. The record also indicates that the parties had

steadily improved their communication and coparenting skills since the entry of the May 2023 custody-modification judgment.

The record indicates that the May 2023 custody-modification judgment provided that the mother was to have a "right-of-first-refusal" regarding caring for the children when the father was unable to do so. The mother asserted that the father had allowed the children to remain with the paternal grandmother when he was unable to provide care for the children at least three times without consulting her first. The mother further noted that, on days that the children were sick or were otherwise not in school, the father had allowed the paternal grandmother to care for the children without offering the mother the opportunity to care for them.

The record also reflects that the father had permitted the mother to exercise expanded visitation in September and October 2023 and in February and March 2024. The father testified that he had accepted the mother's proposed summer-visitation schedule in 2023 and had cooperated with the mother in devising a summer-visitation schedule for the children in 2024. Both of those summer schedules appear to have

expanded the mother's visitation. The mother admitted that the father had not prevented her from exercising her visitation with the children.

The mother expressed concern that, in August 2023, the father had provided the older son with a new cellular telephone that had been previously owned by the paternal stepgrandfather.[2] The mother testified that her telephone number had not been programmed into the telephone and that her number had been blocked from calling the older son's telephone. The father testified that the paternal cousin had programmed the telephone and that he had not had an opportunity to check the telephone before the children's scheduled visitation with the mother following the older son's acquisition of the telephone. He also testified that he had not blocked the mother's telephone number once it was programmed into the telephone and that he and several family members had attempted to correct the issue; the father said that eventually he had taken the telephone to Verizon Wireless, the telephone's service provider, and that it was discovered that a feature had been enabled that

---

[2]The record indicates that this telephone is the older son's second cellular telephone.

forwarded the mother's telephone calls to the older son's voicemail inbox.[3] The father testified that, during the period the cellular telephone would not receive calls from the mother's cellular number, the mother had still been able to call the older son on his tablet and that the older son had been permitted to go to a different room so that he could speak to the mother in private.

The mother and the father both testified that the older son had accessed inappropriate material on a previous telephone. As a result, the mother had requested the passcode to the older son's new telephone and had prohibited the older son from bringing the telephone to visitations until she had obtained the passcode. She testified that the father had failed to provide that passcode to her. The father testified that he had provided the passcode to the older son's telephone to the mother and that she had continued to ask for the passcode to make it appear that he had not cooperated with her. The mother also testified that the older son had sent a "coded" text message to the father; the older son had sent the word "blue" to the father, prompting the father to ask the older son if

---

[3]The father testified that he had taken the telephone to Verizon Wireless on August 8, 2024, the day before the second trial date.

something was wrong. The father denied having used any form of code when he communicated with the children.

The mother also testified that she believed that the father had not adequately monitored and participated in the children's education.[4] The record reveals that, at some point during the 2023-2024 school year, both children's grades had fallen, with the older son earning "C" level grades and the younger son earning lower grades. Both parents indicated that the children were capable of higher grades. The mother asserted in her testimony that the father had not taken an active role in the children's education after he had been awarded sole physical custody of the children and that he had failed to verify that the children were completing their homework assignments.[5] The father testified that he had "worked hard" with the children on their schoolwork and that, after their grades had fallen, he had increased the amount of time he worked with the children

---

[4]At the time of the July 2024 custody-modification trial date, the older son had completed the fifth grade, and the younger son had completed the second grade. Both children had been promoted to their respective next grade levels.

[5]Both parents testified that the homework assignments were not a component of the children's final grades.

on their schoolwork each night. As a result, the father testified, the children's grades had improved after February 2024.[6] The mother testified that, if she were awarded sole physical custody of the children, they would attend schools that were in session four days each week instead of five days each week.[7] The mother further explained that she would be able to better provide for and monitor the children's education if the children attended school in Georgia because, she said, she did not work on Mondays, which coincided with the day that the children would not attend school. Thus, the mother asserted, she would be able to spend more time with the children and better supervise their educations.

---

[6]The children's declining grades were discussed in a February 2024 pendente lite hearing.

[7]According to the mother, the Georgia schools that the children would attend if they were placed in her custody start and end at approximately the same time each day as the Alabama schools the children were attending at the time of the custody-modification trial. The record does not indicate whether the Georgia school year commences earlier in the year or concludes later in the year than does the school year at the children's current schools. The mother did not elaborate on any benefits related to a reduced number of days of weekly school attendance other than to state that the schedule would allow her to spend more time with the children.

The father also testified that the older son's "interventional teacher," Marian Smalley, had been tutoring the children over the summer at the father's request. During the trial, there was significant confusion regarding Smalley's identity. Documentary evidence revealed that the father had referred to Smalley as "Ms. Molly" in text conversations with the mother.[8] The mother testified that she did not know "Ms. Molly" and that the older son's school had reported that they did not have an employee with the last name "Molly." The mother also maintained that she had not known that the older son had an interventional teacher; the father asserted that "Ms. Molly" had been the child's interventional teacher for several years. The father refused to provide Smalley's contact information to the mother because, he said, Smalley had requested that he not provide the mother with that information.[9] The father further testified that the mother had a reputation at the children's schools for harassing the teachers and staff.

---

[8]We generally refer to Smalley by her actual name. We use "Ms. Molly" when appropriate based on the evidence or testimony of the parties.

[9]The father testified that he communicated with Smalley through Facebook Messenger, a text-message application, and that he had deleted their messages "for room" on his telephone.

The mother also testified that the children had demonstrated behavioral issues after the father was awarded sole physical custody. She indicated that the children had generally been disrespectful toward her and at school; she asserted that they had imitated behavior that they had learned from the father. The mother also stated that the older son had displayed "a lot of hate" toward her after she had moved to Georgia. The mother acknowledged that she had moved to Georgia in 2021 after she had remarried and that she had left the children in Alabama with the father at that time. She further admitted that the children's behavior had worsened after she moved to Georgia and conceded that the children's behavior toward her might have been influenced by that decision.

The mother also testified that the children had been diagnosed with attention-deficit/hyperactivity disorder ("ADHD"). She testified that she believed that the father had delayed for several months his providing the forms necessary to schedule the younger son's ADHD tests with the doctor; the father asserted that the younger son's teacher had not

11

returned a form in a timely manner.[10]  The mother testified that, based on the children's diagnoses and behavioral issues, she and the father had agreed in March 2024 to enroll the children in counseling with a counselor located in Columbus, Georgia.[11]  The mother testified that the children's behavior had improved after they began attending counseling and also opined that their behavior had improved, in part, because they had been spending more time with her in the summer.[12]  She also partially attributed the improvement in the children's grades to their counseling sessions.

---

[10]Based on the record, it appears that the children's physician required that the children's teachers and the parents complete specific forms before testing the children for ADHD.  One of the younger son's teachers completed a form for the older son to be tested for ADHD in November 2023.  The father submitted the teacher-completed form and parent form that he had completed for both children to the doctor in February 2024.  The mother testified that she had arrived at that same doctor's office when the father was submitting the forms and that the father had agreed to her request to jointly complete new parent-specific forms at that time.

[11]The parents testified that they had jointly decided to utilize counseling instead of medication for the children's ADHD due to the side effects the medication could have on the children.

[12]The record indicates that the children had individual sessions with the counselor and that the parents generally did not discuss the counseling sessions with the children.

The mother also testified that the paternal grandmother was the primary caregiver for the children; the father asserted that the paternal grandmother's primary child-rearing functions were taking the children to and from school and caring for the children until the father returned home from work. The trial court noted that "in previous hearings" it had believed that the paternal grandmother was too involved in the children's rearing.[13] The mother also testified that the paternal grandmother generally refused to communicate with her.[14] The record indicates that the lack of cooperation between the mother and the paternal grandmother predated the entry of the trial court's May 2023 custody-modification judgment. However, the mother also acknowledged that the children frequently were permitted to telephone the mother when they were in the paternal grandmother's care.

---

[13]The trial court also commented that it was not convinced that the paternal grandmother's actions created a material change in circumstances warranting a change in custody.

[14]Documentary evidence indicated that the father had asserted that the paternal grandmother was not required to communicate with the mother. The trial court noted that that was contrary to its oral instructions in the previous hearings in the current action. The record does not contain a written order relating to communication between the mother and the paternal grandmother.

13

The mother further testified that she believed that it was inappropriate that the older son occasionally slept in the same bed as the paternal grandmother and the paternal stepgrandfather and that she had communicated her concern to the father. She testified that she did not consider the children's sleeping with either parent to be inappropriate. The father testified that, in response to the mother's concerns, he had been working with the children on sleeping in their own beds more consistently and that, as a result, the children generally slept in their own beds.

The mother also expressed concern for the children's physical well being while in the father's care. The mother testified that she frequently had made the two-hour drive from her new residence in Cedartown, Georgia, to Phenix City, Alabama, to transport the children to a medical clinic because she believed that the father and the paternal grandmother frequently had not taken the children to the doctor when she believed it was necessary. The father testified that he believed that the mother generally overexaggerated the children's medical issues. In support of her opinion that the father did not adequately care for the children, the mother recounted a February 2024 incident in which the older son was

bitten by a spider while in the paternal grandmother's care. The mother asserted that the father and the paternal grandmother would not take the older son to the doctor despite the older son's leg being severely swollen, and, she said, they had delayed informing the mother of the older son's condition. The father presented evidence indicating that he had informed the mother of the older son's condition once he became aware of it, and the mother later clarified that the paternal grandmother had sent her a picture of the older son's leg once the mother had requested it. The mother also testified that she had directed the father to have the older son call her "immediately" concerning his injury and that she had been able to speak with the older son about the bite.

The mother also stated that the father had not initially taken the younger son to the doctor regarding an ear infection that had caused the younger son severe pain.[15] The father explained that there was no indication that the younger son was in pain until he was on a telephone call with the mother, and, he said, he had taken the younger son to the doctor once the child began complaining. The younger son also suffered

---

[15]This incident occurred approximately two days before the modification trial began on July 24, 2024.

from fecal impaction, a form of severe constipation, in late 2023. The mother asserted that the father had not adequately cared for the younger son during that time; the father asserted that he had followed the instructions provided by the mother and that he had communicated with the mother regarding the younger son's condition.

At the conclusion of the trial, the trial court asked April Logan-Russell, the children's guardian ad litem, to present a recommendation to the court regarding the children's custody. Logan-Russell initially stated that she did not have a recommendation but that she did have "a whole list of things [that she would] like to talk about." She stated that she believed that the father had intentionally kept the mother "out of the loop" regarding the children and that that type of conduct had predated the entry of the May 2023 custody-modification judgment. She also stated that she believed that the children's behavior toward the mother had improved after they spent more time with the mother; she conceded that the children's separation from the mother was largely because the mother had "left the kids with [the father]." She further noted that she believed that the father and his family had spoken negatively about the

16

mother in the presence of the children.[16] After the trial court again requested a recommendation, Logan-Russell stated the following:

> "Well, here's why I think there could be a material change. The only reason I think that is because [the father] has been put on notice since the very beginning of this thing, and he continues to do the same things that were happening. That's my issue with it. To me, that could be a material change, like why are you not fixing it. You've been told a million times let's try to fix this, so that's my issue. That's why I think there is a material change and that let's give [the mother] a shot at it and see if she has them four days a week and then lets [the father] have them the alternating time and see if that fixes it because these kids are [emotionally] suffering as it stands right now."

The trial court stated on the record that it was "not at all happy about the way the [paternal] grandmother has acted nor am I happy about the way [the father] has acted." The trial court also stated that if it did award the mother custody, it would be because the father was at fault and that if it did not award the mother custody and "[the case] comes back again, [modification will occur] the next time and it's going to be [the father's] fault." In addition, the trial court commented without elaboration that it saw "some possible benefit in a change of custody with the schedule" but stressed that it had not yet decided the issue of the children's custody.

---

[16]The father denied making such comments.

On August 26, 2024, the trial court entered an "Amended Modification Order" awarding the mother sole physical custody of the children subject to specified visitation being awarded to the father.[17] In reaching its decision, the trial court stated that

"[t]he Court is of the opinion that the [m]other has met the burden of proof under McLendon, such that she should be granted physical custody of the minor children over the father. The Court specifically finds, among other things, that based on the ore tenus testimony and evidence presented in open court, the benefits of the change in custody would more than offset the inherent disruptive effect of said change, to wit: that the children, who are suffering with their educations in school, would benefit from smaller classroom settings, a truncated school schedule (Tuesday through Friday), more structure with their [m]other as it appears the [f]ather works long hours and that the children are mostly cared for by the grandparents, and a family home where the children's needs and interests can be the center of focus. Not only was this the recommendation of [Logan-Russell], but the Court has serious concerns about the [f]ather's involvement in the children's rearing at this point.

"This reversal by the Court does not contradict the ... initial concerns about the [m]other's move away to Georgia when she left the children with the [f]ather but highlights the fact that the [f]ather has not, in the Court's opinion, taken his role as sole physical custodian of the minor children with the gravity that such a responsibility deserves. Nor does it appear that the [f]ather's willingness to co-parent is nothing more

_____

[17]The "Amended Modification Order" amended a "Modification Order" the trial court had entered 10 minutes before the amendment. The differences between the two orders have no bearing on our recitation of the facts or our analysis.

18

than a formality, often times giving way to instances of plausible deniability. Nor does it excuse the [m]other's sometimes overbearing conduct during their interactions. They both need to put the needs of the children first!"

The father filed a postjudgment motion asserting that the mother had failed to meet the standard set forth in Ex parte McLendon. After a hearing, the trial court denied the father's postjudgment motion.

On appeal, the father asserts that the evidence did not satisfy the high standard required to modify the physical custody of the children set forth in Ex parte McLendon.

> "'When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: "'A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong....'"'
>
> "Ex parte Fann, 810 So. 2d 631, 633 (Ala. 2001) (quoting Ex parte Perkins, 646 So. 2d 46, 47 (Ala. 1994), quoting in turn Phillips v. Phillips, 622 So. 2d 410, 412 (Ala. Civ. App. 1993)). However, when the question presented on appeal is one of law, the ore tenus rule has no application. Ex parte Perkins, 646 So. 2d at 47. Likewise, there is no presumption of correctness regarding the trial court's application of the law to the facts. Amie v. Conrey, 801 So. 2d 841, 846 (Ala. Civ. App. 2001). This court reviews questions of law de novo. Alabama State Bar v. Caffey, 938 So. 2d 942, 945 (Ala. 2006)."

19

Brooks v. Brooks, 991 So. 2d 293, 300 (Ala. Civ. App. 2008).

Further,

"[t]he law is well settled that '[a] parent seeking to modify a custody judgment awarding primary physical custody to the other parent must meet the standard for modification of custody set forth in Ex parte McLendon[, 455 So. 2d 863 (Ala. 1984) ].' Adams v. Adams, 21 So. 3d 1247, 1252 (Ala. Civ. App. 2009). The custody-modification standard set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984), requires that

> "'the noncustodial parent seeking a change of custody must demonstrate (1) "that he or she is a fit custodian"; (2) "that material changes which affect the child's welfare have occurred"; and (3) "that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child." Kunkel v. Kunkel, 547 So. 2d 555, 560 (Ala. Civ. App. 1989) (citing, among other cases, Ex parte McLendon, 455 So. 2d 863, 865-66 (Ala. 1984) (setting forth three factors a noncustodial parent must demonstrate in order to modify custody)).'

"McCormick v. Ethridge, 15 So. 3d 524, 527 (Ala. Civ. App. 2008). It is not sufficient for a noncustodial parent seeking a modification of custody to show that he or she is a fit custodian. Id. The noncustodial parent must prove all three McLendon factors in order to warrant a modification of custody. Id."

Walker v. Lanier, 180 So. 3d 39, 42 (Ala. Civ. App. 2015). In addition,

"[t]he need for stability in a child's life necessitates the requirement that the party seeking the modification prove to the court's satisfaction that 'material changes affecting the child's welfare since the most recent decree demonstrate that

20

custody should be disturbed to promote the child's best interests.' Wood v. Wood, 333 So. 2d 826, 828 (Ala. Civ. App. 1976). Consequently, frequent disruptions are condemned. Wood."

Hermsmeier v. McCoy, 591 So. 2d 508, 509 (Ala. Civ. App. 1991).

The father asserts that the evidence did not support the presence of a material change in circumstances and that there was no evidence presented to suggest that the benefits of awarding the mother sole physical custody of the children would outweigh the disruptive effect of uprooting the children. We stated in Gallant v. Gallant, 184 So. 3d 387, 393 (Ala. Civ. App. 2014), that,

> "[i]n keeping with the rationale behind the doctrine of res judicata, the supreme court decided that, in order to prevent 'oft-repeated, harassing litigation over the custody of infants,' a final child-custody determination, like any other judgment, could not be reopened for reconsideration of the correctness of the judgment. Sparkman v. Sparkman, 217 Ala. 41, 43, 114 So. 580, 581 (1927)."

However, "if a party could satisfactorily prove that circumstances had changed in a significant way since the entry of the earlier judgment, the doctrine of res judicata would not preclude a new determination of child custody based on those changed circumstances." Gallant, 184 So. 3d at 393. Thus, we emphasize that Ex parte McLendon requires that, in order to prevail on a custody-modification petition, a party seeking to modify a

previous custody judgment must establish that a <u>material change</u> in circumstances has occurred since the entry of the <u>previous</u> custody judgment. <u>See</u> <u>Brooks</u>, 991 So. 2d at 301 (explaining that the parent seeking a modification of custody is "required to show, among other things, that material changes that affect the child's welfare [have] occurred since the original award of custody"). "A material change of circumstances occurs when important facts unknown at the time of the initial custody judgment arise that impact the welfare of the child." <u>K.E.W. v. T.W.E.</u>, 990 So. 2d 375, 380 (Ala. Civ. App. 2007). Thus, because it modified the children's custody, the trial court must have found that a material change in circumstances had occurred since the entry of the May 2023 custody-modification judgment. We conclude that the record does not support such a finding.

The trial court relied on the father's work schedule, the paternal grandmother's role as a caregiver for the children, and the children's declining grades as bases for modifying the May 2023 custody-modification judgment and awarding the mother sole physical custody of the children. Our review of the record indicates that, at the time of the 2024 trial, the father maintained the same employment and schedule

that he had before the entry of the May 2023 custody-modification judgment and that his living situation had also not changed. The record also indicates that the paternal grandmother was a caregiver for the children before the entry of the May 2023 custody-modification judgment and that the issues between her and the mother similarly predated the entry of the May 2023 custody-modification judgment. See S.L.L. v. L.S., 47 So. 3d 1271, 1279 (Ala. Civ. App. 2010) ("Because at the time the juvenile court awarded custody of the child to the father the juvenile court fully expected the father to require a significant amount of assistance from the paternal grandmother, the evidence indicating that the paternal grandmother, in fact, provided such assistance to the father does not indicate a change in circumstances warranting a custody modification."); Johnson v. Johnson, 262 So. 3d 1229 (Ala. Civ. App. 2018) (providing that the father's use of a nanny, which predated the original custody order, did not support a modification in custody). Similarly, as Logan-Russell stated, the parents' issues with communication predated the entry of the May 2023 custody-modification judgment. The record establishes that each of those facts were known to the trial court at the time it entered the May 2023 custody-modification judgment and were

therefore not material changes in the circumstances of the children, and, therefore, those facts could not provide a sufficient foundation to modify the children's custody. See C.E. v. C.C.H., 963 So. 2d 131, 135 (Ala. Civ. App. 2007) (reversing a custody-modification judgment, in part because "[n]othing in the testimony at trial established a material change in circumstances affecting the child's welfare such that custody should be changed").

The only change in the children's circumstances since the entry of the May 2023 custody-modification judgment was the children's declining grades at their respective schools. The father relies on Jenkins v. Jenkins, 541 So. 2d 19, 20 (Ala. Civ. App. 1989), for the proposition that declining grades are not a material change in circumstances when the parents have implemented a plan to correct the declining grades. We note that our holding in Jenkins concerned whether the noncustodial father had proven that a change in custody would materially promote the welfare and best interest of the child, not whether there had been a material change in circumstances. Nonetheless, we agree with the father's assertion that the record in this case does not support a finding that the children's declining grades, by themselves, are a material change

24

in circumstances that affected the welfare of the children. Although both parents testified that the children's grades had declined and that the children were capable of better grades, the record is unclear how far the children's final grades had actually fallen relative to the children's normal grades or how the children's declining grades had affected their welfare. We also note that the father testified that, after the children's grades had fallen, he had increased the amount of time that he spent with the children on their schoolwork, that their grades had improved, and that the children had been promoted to their respective next grade levels. We further note that the father testified that he had invited the older son's interventional teacher to tutor the children during the summer. See, e.g., Ladden v. Ladden, 49 So. 3d 702, 717 (Ala. Civ. App. 2010) (concluding that a child's declining grades were not a material change in circumstances because the custodial mother had personally taken steps to help the child after her grades had fallen and had secured the services of a tutor for the child).

The mother also attempts to rely on Jenkins "as good precedent for the [ore tenus] standard of review … and [as] an excellent example of an

appellate court adhering to that standard."[18]  The mother's brief at 40.

Thus, the mother asserts that this court is effectively bound by the ore

tenus presumption of correctness afforded to the trial court and must

affirm its judgment.  However, our supreme court has held:

> "'[T]he ore tenus standard of review has no application to a trial court's conclusions of law or its application of law to the facts; a trial court's ruling on a question of law carries no presumption of correctness on appeal.' Ex parte J.E., 1 So. 3d [1002,] 1008 [(Ala. 2008)] (citing [Ex parte] Perkins, 646 So. 2d [46,] 47 [(Ala. 1994)], and Eubanks v. Hale, 752 So. 2d 1113, 1144-45 (Ala. 1999)). This Court '"review[s] the trial court's conclusions of law and its application of law to the facts under the de novo standard of review."' Id. (quoting Washington v. State, 922 So. 2d 145, 158 (Ala. Crim. App. 2005))."

Espinoza v. Rudolph, 46 So. 3d 403, 412 (Ala. 2010) (emphasis added).

See also Brooks, 991 So. 2d at 302.  As discussed above, the children's

declining grades did not constitute a material change in circumstances,

and the other facts considered by the trial court were ongoing issues that

predated the entry of the May 2023 custody-modification judgment.

---

[18]In his appellate brief, the father asks us to strike the mother's brief on appeal for untimeliness.  We therefore treat his brief as a motion to strike the mother's brief.  Over the father's objection, we granted the mother's request for an enlargement of time for filing her brief on appeal; her brief was due on May 29, 2025.  The mother filed her brief on May 29, 2025, and, thus, it was timely filed.  Therefore, we deny the father's motion to strike.

Thus, the mother failed to demonstrate that a material change in circumstances had occurred since the entry of the May 2023 custody-modification judgment that would warrant a modification of the children's custody.

The mother attempts to find similarities between the present case and our decisions in R.D.F. v. R.J.F., 271 So. 3d 831 (Ala. Civ. App. 2018), and Goetsch v. Goetsch, 990 So. 2d 403 (Ala. Civ. App. 2008). However, those cases are distinguishable from the present case. In R.D.F., the record contained evidence indicating that the father's conduct had caused emotional damage to the children in that case. Similarly, in Goetsch there was evidence to indicate that the children in that case had been subjected to emotional abuse in the custody of the custodial parent. In contrast, the record in the present case contains no indication that the children had been emotionally or physically harmed by the father's work schedule, the paternal grandmother's care of the children during the father's working hours, or the communication issues between the parents.

The mother further asserts that the record presents an "amalgamation" of issues that, when taken together, meet the Ex parte

27

<u>McLendon</u> standard. We emphasize that the majority of the issues relied on by the trial court in the August 2024 judgment concerned issues that were presented in the April 2023 custody-modification trial and had persisted since before the entry of the May 2023 custody-modification judgment. The mother presented no evidence of any facts that were unknown to the trial court before the 2024 modification trial that would indicate that a material change of circumstances had occurred, <u>see</u> <u>K.E.W.</u>, 990 So. 2d at 380; instead, the record clearly discloses that the mother relied on ongoing issues that the trial court was aware of during the April 2023 custody-modification trial and that existed both before and at the time of the entry of the May 2023 custody-modification judgment. The children's declining grades, which had improved since the father had made a dedicated effort to work with the children on their education, was the only new or previously "unknown" fact presented at trial. Thus, the record does not contain an "amalgamation" of issues sufficient to establish a material change in circumstances.

"[W]e are compelled to reiterate that, in matters of child custody, frequent disruptions are discouraged." <u>Vick v. Vick</u>, 688 So. 2d 852, 856 (Ala. Civ. App. 1997). The modification petition at issue in this case was

28

filed approximately four months after the entry of the May 2023 custody-modification judgment and nine days after the denial of the mother's postjudgment motion directed to that judgment. The modification petition was largely based on many of the issues presented in the April 2023 custody-modification trial and reiterated the grounds recited in the mother's postjudgment motion. Because the bases of the mother's custody-modification petition were largely repetitive of concerns raised and litigated in the April 2023 custody-modification trial, indicating that those concerns were ongoing issues between the parties and not new changes in the circumstances that had materially affected the children, those concerns could not serve as a basis for a modification of custody under Ex parte McLendon.[19] The changes in the children's grades that had occurred since the entry of the May 2023 custody-modification

---

[19]We note that the "recommendation" made by Logan-Russell largely relied on what she asserted were the father's ongoing coparenting issues and that her statement that the trial court should "give [the mother] a shot" at having sole physical custody of the children "to see if that fixes it" does not comport with the requirement in Ex parte McLendon that a material change in circumstances be established before a trial court may modify a previous custody judgment.

judgment were similarly not material changes that would justify a modification in the children's custody.

The record does not reflect that the mother established that a material change in circumstances had occurred since the entry of the May 2023 custody-modification judgment. See Ex parte D.B., 255 So. 3d 755 (Ala. 2017). Because nearly all the facts presented to the trial court predated the entry of the May 2023 custody-modification judgment, the trial court improperly applied the law to the facts presented to it. See Brooks, 991 So. 2d at 300. Accordingly, we reverse the trial court's August 2024 judgment and remand the case for the entry of a judgment denying the mother's custody-modification petition.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.